In re Joe Edward **HENDERSON** and Sally Buher Henderson, Debtors.

Richard P. **JAHN, Jr.,**
Trustee, Plaintiff,

v.

**ECONOMY CAR LEASING, INC., Defendant.**

Bankruptcy No. 1–87–00894.
Adv. No. 1–88–0023.

United States Bankruptcy Court, E.D. Tennessee, S.D.

Feb. 7, 1989.

Richard Jahn, Jr., Chattanooga, Tenn., for plaintiff.

O. Michael Carter, Chattanooga, Tenn., for defendant Economy Car Leasing.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

In this case the trustee seeks to recover approximately $88,000 in transfers from debtor Joe Henderson to defendant Economy Car Leasing, Inc. ("Economy") which occurred more than ninety days prior to but within one year of the filing of debtors' bankruptcy petition. The success of the trustee's action depends upon whether Economy was an insider at the time of the transfers. Because the court concludes Economy was not an insider at the time of the transfers, the trustee's action must fail.

This is a core proceeding. 28 U.S.C.A. § 157(b)(1) and (2)(F) (West Supp.1988).

### I.

The parties have stipulated the facts to be as follows:

"1. Joe Edward Henderson and wife filed a Chapter 7 Bankruptcy Petition on April 17, 1987. Richard P. Jahn, Jr. was appointed Trustee. Economy Car Leasing, Inc. ("Economy") is a Tennessee corporation, which at all times material was in the business of car rental and leasing. Its principal place of business is presently at 5303 Highway 153, Hixson, Tennessee 37343.

2. Economy first began doing business in 1980. Its principal owners are Freeman Smith and his brother. From the onset of the business, Joe Henderson was hired to manage the rental and leasing programs of Economy. In November or December, 1985 Henderson was made Vice–President of Economy. After being made an officer he continued as general manager of Economy.

3. On July 25, 1986 Freeman Smith was told that Henderson was improperly divert-ing corporate money and property for his own personal use and benefit. He immediately went to the main office of Economy and examined documents in and around Joe Henderson's desk. Henderson was not there at the time. This examination confirmed Smith's suspicions. On that day Smith notified the company attorney, Mike Carter, of the situation. Carter later that day had a title search of Henderson's house conducted and believed from that search that Henderson owned his home free and clear.

4. On July 16, 1986 Smith hired a locksmith to change the locks in Economy's offices. He then called Henderson to his office. Smith told him at that time that his employment relationship (both job and office) were terminated and basically that Smith knew that Henderson had been converting company funds. Smith did not discuss with Henderson how much money had been taken. Henderson left the office that day and never returned.

5. Mike Carter happened to be an acquaintance of Henderson and spoke with him about the situation on the morning of July 28, 1986. Henderson was very distraught and was seriously contemplating suicide. However, Henderson did relate to Carter a desire to settle with Economy. Carter relayed this to the Smiths. After consulting together, the Smith brothers decided that it would be better for them to recover assets than to actively seek to prosecute Henderson.

6. On July 30, 1986 Mike Carter prepared an agreement which was signed by the Hendersons and Economy. The substance of the agreement was that the Hendersons would transfer their home, subject to existing liens, to Economy. Additionally, within 30 days they would transfer $40,000.00 in cash to Economy. They also signed a non-dischargeable promissory note for $125,000.00 to Economy. Economy agreed that it would never comment on the reasons for Henderson's termination unless required by law or court proceeding to do so. The agreement recited that $250,-000.00 was diverted by Henderson, but

Economy believes at this time that the diversions were close to $400,000.00.

7. On July 30, 1986 the Hendersons executed a warranty deed to Economy transferring their home located at 9323 Standifer Gap Road. It had been determined that the title check made on July 25 had been in error, as First Tennessee Bank had an existing lien of approximately $115,000.00 on same. This house eventually sold on September 2, 1987 for $175,000.00. After deducting sale expenses, Economy received $48,271.96 in equity in the house.

8. On July 30, 1986 Henderson delivered $8,000.00 cash to Mike Carter for Economy. On September 2, 1986 Joe Henderson delivered $32,000.00 to Mike Carter for Economy consisting of the following checks and cash:

| | |
|---|---|
| Janet Pratt | $ 2,000.00 |
| Don Williams | 590.00 |
| W.S. Henderson | 20,000.00 |
| W.S. Henderson | 3,610.00 |
| Kubota Mfg. | 350.00 |
| Performance Media | 500.00 |
| Cash | 4,950.00 |
| | $32,000.00 |

The checks were made payable to Joe Henderson. He endorsed each of them over to Mike Carter, Attorney. Carter deposited them in his Trust Account and later paid all proceeds over to Economy. No significant payments were made by the debtors on the $125,000.00 note prior to bankruptcy. The Hendersons were insolvent at the time of the transfer.

9. The exact amount of money taken by Henderson has never been determined. The July 30, 1986 agreement recited a $250,000.00 loss, but this was a figure estimated by Economy at the time. Economy initially did locate some of its loaned vehicles but has not endeavored to trace any of its still missing funds into assets held by Henderson or others. Economy believes that Henderson took cash from rentals, barter for vehicles in exchange for work on his home, and kept sales of returned automobiles.

10. After leaving the employment of Economy, Joe Henderson went to work for another car dealership. Economy has not revealed to any inquiring party any of the details concerning Henderson's termination of employment, except for facts revealed in this proceeding. As of this date Joe Henderson has not been criminally prosecuted for any of the alleged wrongdoings at Economy.

11. The parties stipulate that Economy received more from the transfers than it would under this Chapter 7 proceeding."

The parties also stipulated three exhibits: the bankruptcy petition of debtors filed April 17, 1987, the promissory note of June 30, 1986, and the agreement of June 30, 1986. The agreement executed by the debtors and Economy provides in relevant part:

1. That Joe E. Henderson was a Vice-President of the Corporation. That during his employment as such there were certain unauthorized transactions and withdrawals of money and other unauthorized uses of assets and credit of said Corporation. That all parties hereto desire to settle the civil litigation which could arise from this matter by their execution of this document.

2. The parties hereby stipulate the unauthorized and fraudulent transactions to have resulted in the diversion of $250,000.00 to Economy Car Leasing, Inc., a Tennessee Corporation of which Joe E. Henderson and wife, Sally B. Henderson have enjoyed the benefits thereof.

NOW, FOR AND IN CONSIDERATION of the mutual covenants not to proceed with civil litigation involving these transactions, the parties hereby mutually covenant and agree to settle all rights and controversies upon the following terms and conditions:

1. The parties' home owned by Joe E. Henderson and wife, Sally B. Henderson shall be conveyed in fee simple by Warranty Deed of even date together with the mortgage thereon to Economy Car Leasing, Inc., a Tennessee Corporation. Joe E. Henderson and Sally B. Henderson agree to vacate the home within sixty (60) days of the date of this agreement.

2. Joe E. Henderson and Sally B. Henderson warrant that there are no liens or mortgages against said property but for the mortgage to First Tennessee Bank, N.A.

3. That within thirty (30) days of the date of this document $40,000.00 in cash or certified funds will be deposited to the trust account of O. Michael Carter for delivery to Economy Car Leasing, Inc., a Tennessee Corporation.

4. That Joe E. Henderson and wife, Sally B. Henderson, do hereby jointly and severally agree to pay to Economy Car Leasing, Inc., a Tennessee Corporation, the sum of $125,000.00 with ten percent (10%) interest for thirty (30) years. Prepayment of any indebtedness remaining on this obligation, evidenced by a Promissory Note of even date, shall be allowed without penalty. The monthly payment shall be $1,096.93.

5. The parties hereto agree that they will not reveal the contents of this document to anyone unless compelled to do so by subpoena, suit to enforce collection or similar act of law. That only three (3) copies of this document shall exist. It shall be kept sealed by each party unless forced by the contingencies cited in this paragraph to be revealed. That any inquiry made of Economy Car Leasing, Inc., a Tennessee Corporation, or any of its principals or representatives concerning the employment of Joe E. Henderson that the only authorized response that shall be given is that Mr. Henderson was terminated on July 30, 1986, and that no comments will be made concerning reasons for his termination.

6. Joe E. Henderson hereby further covenants with Economy Car Leasing, Inc., a Tennessee Corporation, to assist in the recovery of all assets. Further, that he has made full revelation of all assets owned by Economy Car Leasing, Inc., a Tennessee Corporation, or other parties which is the the rightful property of Economy Car Leasing, Inc., a Tennessee Corporation.

7. It is specifically agreed by and between the parties to this agreement that the debt settled and compromised by this agreement is a debt which is not subject to discharge from the United States Bankruptcy Code Title 11 Section 523(a)(4) or any other section of the Bankruptcy Act. It is acknowledged and agreed by and between the parties that the acknowledgment of this debt as a fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny, as provided by said section which is directly applicable. It is this representation upon which this agreement is made.

8. It is acknowledged by and between the parties that Joe E. Henderson and wife, Sally B. Henderson have had adequate opportunity to discuss these matters among themselves, independent counselors, including attorneys.

9. That they entered into this agreement knowingly, voluntarily and have considered all of the ramifications attendant hereto. That no force or coercion of any kind has been applied by any of the parties hereto and that the said agreement was the result of the initiative of Joe E. Henderson and wife, Sally B. Henderson.

10. That by execution of this agreement Economy Car Leasing, Inc., a Tennessee Corporation, releases Joe E. Henderson and wife, Sally B. Henderson from any and all obligations not specifically set forth herein.

## II.

The trustee seeks to avoid the payments made by debtor Joe Henderson to Economy arguing they constitute preferences under § 547(b) of the Bankruptcy Code. That section reads:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (West 1979 & Supp. 1988).

To avoid a transfer as being a preference, the trustee must prove each element under § 547(b) by a preponderance of the evidence. *Jahn v. Fassnacht (In re Fassnacht & Sons, Inc.),* 826 F.2d 458, 460 (6th Cir.1987); *Matter of Prescott,* 805 F.2d 719, 726 (7th Cir.1986); *Luring v. Miami Citizens Nat'l Bank & Trust Co. (In re Val Decker Packing Co.),* 61 B.R. 831, 842 (Bankr.S.D.Ohio 1986).

The parties stipulated the debtors were insolvent at the time of the transfers. They also stipulated the transfers enabled Economy to receive more than it would have received in the debtors' chapter 7 case. Hence, the third and fifth elements are not in dispute.

■ The first element—whether the transfers were to a creditor—and the second element—whether the transfers were for an antecedent debt owed by the debtor before the transfers were made—are also satisfied. The debtors and Economy entered into an agreement in which the debtors promised to make certain restitution payments to Economy in return for Economy's pledge not to sue debtors or disclose the reason for Joe Henderson's termination. Economy in essence settled the matter quietly with the debtors through contract rather than through civil litigation or criminal prosecution. In similar circumstances, courts have held such restitution agreements establish a debtor-creditor relationship. *Rajala v. Bowlus School Sup-*

*ply, Inc. (In re Kirk),* 38 B.R. 257, 260 (Bankr.D.Kan.1984); *Bakst v. Atlantic Nat'l Bank (In re Kayajanian),* 27 B.R. 711, 712 (Bankr.S.D.Fla.1983); *Button v. Sheridan Oil Co. (In re Button),* 18 B.R. 171, 172 (Bankr.W.D.N.Y.1982). Payments made in accordance with such restitution agreements are payments made to a creditor on an antecedent debt and may be preferences if the other elements of § 547 are satisfied. *Rajala v. Bowlus School Supply, Inc. (In re Kirk),* 38 B.R. at 259–60; *Bakst v. Atlantic Nat'l Bank (In re Kayajanian),* 27 B.R. at 712.

■ The remaining question is whether Economy was an insider at the time of the transfers in this case. It is not enough that the transferee was at one time an insider. Section 547(b) by its terms, and case law construing the statute, make clear that insider status must be present at the time of the transfer, or at least at the time the transfer was arranged. *See Chase Manhattan Bank, N.A. v. Dent, A.I.M., Inc. (In re Trans Air, Inc.),* 79 B.R. 947 (Bankr.S.D.Fla.1987); *DeRosa v. Buildex, Inc. (In re F & S Cent. Mfg. Corp.),* 53 B.R. 842, 849 (Bankr.E.D.N.Y.1985); *Guardian Equip. Corp. v. Conkie (In re Guardian Equip. Corp.),* 20 B.R. 824, 825 (Bankr.S.D.Fla.1982); *McWilliams v. Gordon (In re Camp Rockhill, Inc.),* 12 B.R. 829, 832 (Bankr.E.D.Pa.1981); *Lischka v. Vienna Int'l Corp. (In re Vienna Int'l Corp.),* 17 B.R. 147, 151 (Bankr.D.Haw. 1982).

The term "insider," as it relates to individual debtors, is defined in § 101(30)(A) of the Bankruptcy Code as follows:

(30) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control.

11 U.S.C.A. § 101(30) (West Supp.1988).

As can be seen, "insider" is defined by way of examples. The examples, however,

are not meant to be exhaustive. When the verb "includes" is used to define a particular word, it usually imports a general class with only some of the class' particular instances specified in the definition. *See Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 n. 1, 55 S.Ct. 60, 61 n. 1, 79 L.Ed. 232 (1934); *United States v. Gertz*, 249 F.2d 662, 666 (9th Cir.1957). As § 102(3) of the Bankruptcy Code makes clear, the terms "includes" and "including" are not limiting. 11 U.S.C.A. § 102(3) (West 1979).

In the instant case, Economy does not fall within any of the designated insider categories listed under § 101(30)(A). Thus, the question is whether at the time of the transfers Economy was one of those unmentioned insiders implicitly included within the scope of § 101(30)(A).

According to the legislative history accompanying the statutory definition of insider, "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." H.R.Rep. No. 595, 95th Cong., 2d Sess. 312, *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 5963, 6269. Although the legislative history does not expressly state why insiders are treated differently from other creditors, one commentator has suggested Congress intended to ameliorate the insider's potential leverage in dealing with the debtor shortly before bankruptcy. *See* Nimmer, *Security Interests in Bankruptcy: An Overview of Section 547 of the Code*, 17 Hous.L.Rev. 289, 293 n. 10 (1980). Because of his close relationship with the debtor, an insider typically knows more about the debtor's financial affairs than the debtor's other creditors, and is often in a position to influence or control, at least in part, the debtor's actions. An insider is usually the first to know that a debtor is contemplating bankruptcy. Armed with this information and power to control the debtor, the insider may step ahead of other creditors demanding payment and then influence the timing of the debtor's bankruptcy petition to avoid the ninety-day preference period. By extending the preference liability of insiders to one year, Congress made it more diffi-cult for an insider to manipulate the timing of bankruptcy so as to avoid the effect of the preference section. *Id.*

The test utilized by a number of courts in determining who is an insider focuses on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor. *Miller v. Schuman (In re Schuman)*, 81 B.R. 583, 586 (9th Cir.BAP 1987). One court has stated that one is an insider "if as a matter of fact, he exercises such control or influence over the debtor as to render their transactions not arm's length." *Kepler v. Schmalbach (Matter of Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986). Another court defined an insider as "one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arm's length transaction." *Loftis v. Minar (In re Montanino)*, 15 B.R. 307, 310 (Bankr.D.N.J.1981). Whether an entity is an insider is a question of fact which must be determined on a case-by-case basis. *Wilson v. Huffman (In re Missionary Baptist Found.)*, 712 F.2d 206, 210 (5th Cir.1983); *UVAS Farming Corp. v. Laviana Inves., N.V. (In re UVAS Farming Corp.)*, 89 B.R. 889, 892 (Bankr.D.N.Mex.1988); *Jackson Purchase Prod. Credit Assoc. v. Taylor (In re Taylor)*, 29 B.R. 5, 7 (Bankr.W.D.Ky.1983).

Despite the general and somewhat relative language used by courts in describing how insiders are to be identified such as "closeness of the parties" and "degree of control," it appears that in cases in which the relationship at issue is not one of the relationships enumerated in § 101(30)(A), the relevant inquiry is whether the relationship nonetheless falls within the general class of insiders contemplated by the statute. *See Helvering v. Morgan's, Inc.*, 293 U.S. at 125 n. 1, 55 S.Ct. at 61 n. 1. One way to undertake this analysis, if indeed the insider examples cited in the statute are to provide any guidance, is to consider whether the relationship at issue is similar to or has characteristics of any of the relationships defined as insider relationships under § 101(30)(A). If it does, insider status may well be present, depending of

course upon the degree of similitude. If it does not, the relationship probably does not fall within the general class of insiders of individual debtors.

In this case, it is clear the relationship between Joe Henderson and Economy abruptly came to an end when Henderson was terminated from his employment at Economy. No longer was there a relationship even remotely similar to the examples of insiders listed under § 101(30)(A).

One may still argue, however, that Economy was in a position to control Henderson because it had the power to initiate a criminal action against him. The fallacy of this argument is that the potential to control or influence the debtor does not stem from any insider relationship; it stems, if at all, from Economy's ability to prosecute the debtor for a crime. The bargaining position Economy had over Henderson at the time of the transfers was a bargaining position that would have existed in favor of Economy over anyone caught stealing from Economy, whether or not they happened to be an Economy employee. The fact that Economy would be in a strong position to negotiate a return of its property from a malefactor does not make Economy the malefactor's insider. Such bargaining position, absent any close relationship comparable to the examples under § 101(30)(A), is not enough to create insider status. *See Hunter v. Babcock (In re Babcock Dairy Co.)*, 70 B.R. 657, 661 (Bankr.N.D.Ohio 1986) ("[i]t is insufficient that the alleged insider had only a superior bargaining position in a contractual relationship with the Debtor"); *Schick Oil & Gas, Inc. v. Federal Deposit Insurance Corp. (In re Schick Oil & Gas, Inc.)*, 35 B.R. 282, 285 (Bankr. W.D.Okla.1983) ("[s]imply because the bank had financial power over the debtor does not make the bank an insider for that reason"). Economy may well have been an insider of Joe Henderson up to the time he was fired from the company. After that date, however, the only relationship existing between Economy and Henderson was that of victim and offender. The facts do not support a conclusion that Economy fell within the general class of insiders contemplated by § 101(30)(A) at the time of the transfers in this case.

In addition, the court cannot conclude from the stipulated facts that the restitution agreement was anything other than an arm's length transaction between the debtors and Economy. There is no suggestion that the diversion by Henderson of at least $250,000 from Economy did not take place. Likewise, there is no indication that Economy dictated the terms of the settlement agreement or engaged in overreaching because of any possible control over the debtors. In fact, it appears the debtors may have benefited most from the deal since Economy now believes the diversions by Henderson were close to $400,000 rather than the $250,000 it settled for.

The payments made to Economy by the debtors fall outside the ninety-day period prior to the debtors' bankruptcy. Because Economy was not an insider of the debtors at the time the transfers were arranged or carried out, the trustee cannot avoid the transfers under § 547(b).[1]

An order will enter in accordance with this memorandum dismissing the trustee's complaint.

1. Economy also argues that the court should find the debtor held the misappropriated property from Economy in a constructive trust and that the moneys returned to Economy were not transfers of debtor's property, but were transfers back to Economy of Economy's property. To succeed on this theory, it was incumbent upon Economy to show that the funds it received from the debtors were in fact the stolen property from Economy or a product of the stolen property. *McDowell v. McDowell*, 144 Tenn. 452, 234 S.W. 319 (1921); Banks, *A Survey of the Constructive Trust in Tennessee*, 12 Mem.St.U.L.Rev. 71, 112–16 (1981). Economy was unable to make this showing.