**In re STANDARD STORES, INC., Debtor.**

**Max H. RUSH, as trustee, Plaintiff,**

v.

**William RIDDLE, Defendant.**

**Bankruptcy No. LA 87–22619–VZ. Adv. No. LA 90–0985.**

United States Bankruptcy Court, C.D. California.

Feb. 20, 1991.

Anthony J. Passante, Jr. of Prendiville & Passante, Santa Ana Heights, Cal., for defendant, William Riddle.

Lewis R. Landau of Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, Cal., for plaintiff, Max Rush.

Max R. Rush, Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, Cal., Trustee.

1. Trustee did not allege. in the Complaint a claim for relief under 11 U.S.C. § 550 for recovery of an avoided transfer. Nevertheless, as Trustee gave notice his request for recovery of the Transfer in the summary request for relief concluding the Complaint, Riddle cannot complain that he did not have notice of the Trustee's request for relief under § 550.

## OPINION ON THE SCOPE OF 11 U.S.C. § 101(30)

VINCENT P. ZURZOLO, Bankruptcy Judge.

■ Max H. Rush ("Trustee"), trustee in this chapter 7 case, commenced this adversary proceeding by filing his "Complaint to Avoid Preferential Transfer(s)". The only named defendant is William Riddle ("Riddle"). In the Complaint, Trustee seeks to avoid as preferential under 11 U.S.C. § 547 and apparently recover[1] a transfer of funds in the amount of $25,208.22 (the "Transfer") made to Riddle by Standard Stores, Inc. ("Debtor"), debtor in this chapter 7 case.

■ After conducting discovery and conferring with each other, the parties submitted a stipulated joint pre-trial order in which they agreed that the only issue to be tried is whether Riddle was an insider within the meaning of 11 U.S.C. § 101(30) at the time of the Transfer.[2]

This issue is significant because the Transfer took place more than 90 days and less than one year before the commencement of this bankruptcy case; therefore, even though Riddle has stipulated to all of the other elements of a claim for relief under 11 U.S.C. § 547, he will defeat the Trustee's claim if Trustee cannot establish Riddle was an insider at the time of the Transfer.

### I.

### FINDINGS OF FACT

I make the following findings based upon the joint pre-trial order and the testimony of Riddle and Raymond K. Freeman ("Freeman"), the only witnesses who testified at the trial.

2. In the joint pre-trial order, the parties characterize this issue as one of law. I disagree. In *In re Schuman*, 81 B.R. 583, 586, Fn. 1 (9th Cir. BAP 1987), the court made it clear that the issue of whether defendant is an insider is a mixed question of law and fact, if not solely a question of fact.

In 1976, Freeman and two other individuals, Bauer and Copsey, founded the Debtor. The Debtor's business was owning and operating auto parts stores and an automobile engine shop in Southern California. Freeman was a shareholder in and a director and the president of Debtor. Bauer was vice-president of Debtor and Copsey was a director of Debtor.

Riddle has known Freeman since 1953, when Riddle married Freeman's sister. Riddle moved to Southern California in 1978. Soon Riddle went to work for Debtor as a counter salesperson in one of Debtor's auto parts stores. After approximately one year, Riddle left his job at Debtor to work for an unrelated entity. At the request of Freeman and Bauer, Riddle returned to Debtor in 1980 or 1981 to manage one of Debtor's auto parts stores. After a few years, Riddle was promoted to the position of general manager of Debtor. Before Riddle's promotion, Debtor had never employed a general manager. As general manager, Riddle assumed some of the management duties previously performed by Freeman and Bauer and also undertook duties which had not previously been performed by anyone. Among other functions, Riddle trained store managers, recommended salaries for personnel, supervised the remodeling of stores and oversaw the training of sales personnel.

In 1982, Riddle divorced Freeman's sister. Nevertheless, Riddle remained a valued employee of Debtor. Indeed, Riddle testified that the divorce caused no change in his relationship with Freeman and that he considered Freeman "family".

In his position as general manager of Debtor, Riddle did not have the authority to write checks, order parts, or terminate the employment of management personnel without Bauer's or Freeman's authorization. Riddle also testified that he did not regularly receive financial information concerning Debtor; nor did he share offices with Freeman, Bauer and Copsey. Riddle, however, did have access to Debtor's financial information.

Riddle testified that he became increasingly frustrated in his role as general manager of Debtor because he was not given authority by Freeman and Bauer to "modernize" the Debtor's stores or to "computerize" the stores' operations. This frustration led Riddle to quit his position as general manager of Debtor in 1987. No one was hired to replace Riddle as general manager of Debtor.

Before Riddle quit, Freeman, on behalf of Debtor, approached him for a loan. Freeman told Riddle that Debtor was experiencing cash flow problems and that Debtor wanted to borrow $25,000 from Riddle. Riddle agreed. This agreement was reduced to a written "Loan Agreement," dated May 5, 1987. According to the Loan Agreement and the testimony of Riddle and Freeman, Riddle's loan was in the amount of $25,000 and accrued interest at the rate of 10% per annum. The loan was to be repaid from refunds the Debtor would receive from the cancellation of life insurance policies under which it was the beneficiary and Bauer, Copsey, and Freeman were the insured.

There is no contention that the loan was secured by the policy refunds or by any other collateral. Rather, Riddle testified that he made the loan solely in reliance upon Freeman's assurance that Freeman would cause Debtor to repay Riddle from policy refunds as soon as these refunds became available. Riddle also testified that he did not make any inquiry into Debtor's financial condition before making the loan. Freeman affirmed Riddle's testimony and added that he personally guaranteed repayment of the loan.

I found this portion of Riddle's testimony unbelievable. Riddle testified that $25,000 was a significant portion of his life savings. Nevertheless Riddle testified that he made the loan to Debtor on an unsecured basis with no knowledge of Debtor's ability to repay it, and strictly upon the assurances and oral guarantee of Freeman.

Freeman testified that shortly after Riddle left Debtor, Debtor received the refunds on its insurance policies and Freeman caused Debtor to repay Riddle. On or about June 3, 1987, Freeman gave Riddle a check in the amount of $7,208.33, another

check in the amount of $9,000 and a third check in the amount of $9,000.[3] The total of $25,208.22 was intended to repay the principal amount of the loan made by Riddle to Debtor and the interest accrued pursuant to the Loan Agreement.

Either simultaneously with or shortly after the making of the Transfer, Debtor's repayment of Riddle's loan, and Riddle's leaving Debtor, Riddle caused a corporation named "All Automotive Products, Inc." (the "New Corporation") to be incorporated. The name of the New Corporation was identical to a "dba" previously used by Debtor. The Articles of Incorporation of the New Corporation, plaintiff's Exhibit 1, were prepared by attorney Jerome Edelman, Debtor's attorney. According to a statement submitted by Riddle to the California Secretary of State, Riddle was the chief executive officer, chief financial officer and a director of the New Corporation.

The New Corporation was formed to facilitate Riddle's purchase of two of the auto parts stores owned by Debtor. The purchase price was $90,000. Riddle paid $30,000 in cash as a down payment. Riddle signed a note for the balance of the purchase price on September 10, 1987. Subsequently the New Corporation hired five individuals who were either store managers for Debtor or were involved in corporate management of Debtor, including Bauer, the former vice president of Debtor.

Riddle testified that when he negotiated the purchase of the two stores from Debtor he neither requested nor received any financial information regarding Debtor or the two stores. This testimony was not credible. Riddle testified that he was an experienced and successful businessman who had owned several businesses before working for Debtor. I do not believe that someone with Riddle's experience and expertise would purchase a significant portion of a retail business without investigating the financial condition of the vendor.

3. Riddle testified that he requested that the payment be made in three checks to avoid the

## II

## WAS RIDDLE AN INSIDER AT THE TIME OF THE TRANSFER?

11 U.S.C. § 101(30) provides in pertinent part as follows: "Insider" *includes*—

(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) *relative of a general partner, director, officer, or person in control of the debtor;* or

(F) *managing agent of the debtor* (emphasis added).

Trustee argues that Riddle is an insider for at least one of the three following reasons:

1. Riddle was a relative of an officer and director of Debtor at the time of the Transfer;
2. Riddle was a managing agent of Debtor at the time of the Transfer; and/or
3. Riddle had a relationship with Debtor that rendered the Transfer a transaction not conducted at arm's length.

I discuss each argument below.

A. *Relative of An Officer and Director of Debtor.*

■ 11 U.S.C. § 101(41) provides that " 'relative' means individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree."

There can be no dispute that during Riddle's marriage to Freeman's sister, he was related by affinity within the third degree to Freeman, a director and officer of Debtor. However, Riddle divorced Freeman's sister before the Transfer was made. There is no evidence that Riddle was "relat-

scrutiny of the Internal Revenue Service.

ed" to Freeman or any other officer or director of Debtor at the time of the Transfer by affinity or consanguinity within the third degree.

Trustee argues that the word "affinity" means more than a relationship by marriage. Trustee bases his argument on the decision in *In the Matter of Montanino*, 15 B.R. 307 (Bankr.D.N.J.1981). In *Montanino* the court was asked to decide whether the fiancee of the debtor, who lived in the same house with the debtor for five years, was a "relative" within the meaning of 11 U.S.C. § 101(41). The *Montanino* court analyzed this issue as follows:

> Black's Law Dictionary, Fifth Edition, p. 54 includes among its definitions for the word "affinity" the following: "A close agreement; relation; spiritual relation or attraction held to exist between certain persons."
>
> The use of the word "includes" in the definition of an insider is not a limiting term and cannot be so construed as § 102(3) specifically provides that the words "insider" and "including" are not limiting.
>
> Thus, it is clear that by the use of the word "includes," Congress did not intend to limit the classification of insiders to relatives by marriage or consanguinity. *In re Montanino*, 15 B.R. 307, 309–310.

This analysis is not persuasive. In § 101(41), the word "affinity" is qualified by the phrase "within the third degree as determined by the common law." This qualifying phrase is rendered meaningless if one defines affinity as merely a close relationship or an attraction. This phrase makes sense only if "affinity" is defined as a relationship by marriage, which is the meaning of the Latin root of "affinity," i.e., affinis. *See, Webster's II New Riverside University Dictionary*, (1984) p. 83. *See also, In re Schuman*, 81 B.R. 583, 585 (9th Cir. BAP 1987) (a former spouse is not related by affinity within meaning of § 101(41)). The use of the word "includes" in § 101(30) does not allow me the discretion to expand the meaning of "relative" as defined in § 101(41). Therefore Riddle was not an insider of Debtor at the time of the Transfer pursuant to 11 U.S.C. § 101(30)(B).

## B. *Managing Agent*

■ Unfortunately Congress did not define "managing agent" as precisely as it defined "relative." In fact, Congress has not defined this term. A leading commentator offers no help. 2 *Collier on Bankr.* ("Collier") ¶ 101.30 (15th Ed.). Courts have provided little guidance in published decisions. *See, In re National Real Estate Ltd. Partnership II*, 87 B.R. 986 (Bankr.E.D.Wis.1988) (real property manager held to be insider within meaning of 11 U.S.C. § 101(30)(F) with no stated analysis).

■ Therefore, the term "managing agent" is ambiguous. In construing an ambiguous provision in a statute, a court should construe it so that it is consistent with the entire statute. *Board of Educ. of Westside Community Schools v. Mergens*, — U.S. —, 110 S.Ct. 2356, 2383, 110 L.Ed.2d 191 (1990).

The focus of nearly all the subdivisions of § 101(30) is on those entities that exert or could exert control or influence over the debtor. There are exceptions; e.g., a relative of a director or officer of a corporate debtor is an insider whether or not that relative could exert control or influence over the debtor.

■ In defining "managing agent," I therefore conclude that it refers to those entities that exert or could exert operational control over a debtor, a division or unit of a debtor, or a significant portion of a debtor's property. Such operational control would ordinarily include the ability to make personnel decisions, the authority to incur or pay obligations and access to financial and other information essential to the operation of the debtor. An example of a "managing agent" would be a person in charge of a division of a corporate debtor who, nevertheless, is not an officer or director.

This definition of "managing agent" is consistent with the principal design of § 101(30) and does not overlap or conflict with the categories of insiders expressly

described in the preceding subsections of that statute.

As an employee of Debtor, Riddle was an agent of Debtor. He was also the general *manager* of Debtor. Nevertheless, Riddle did not have the authority to pay or direct payment of obligations, he could not order parts, and he could not hire or fire store managers without the express authorization of Freeman and Bauer. Therefore Riddle was not an insider of Debtor at the time of the Transfer pursuant to § 101(30)(F).

### C. *Insider By Virtue of the Word "includes"*

■ As discussed above, § 101(30) begins with the words: "'insider' *includes* ..." (emphasis added). By using the word "includes," Congress expanded the definition of "insider" beyond the expressly, and sometimes precisely defined, categories in subsections (A) through (F) of the statute. 11 U.S.C. § 102(3); *In re Schuman*, 81 B.R. 583, 586 (9th Cir. BAP 1987) and cases cited therein.

Although it is clear that an entity can be an insider even if it does not fall within one of the subsections of § 101(30), it is far from clear how a court is to exercise its discretion in determining what an insider is. The legislative history of § 101(30) provides that an insider "is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S.Rep. No. 95–989, 95th Cong., 2d Sess. 25 (1978) and H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 312 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5810, 6269 (*"House Report"*), reprinted in *Collier*, Appendices 2 and 3. This language provides some guidance but not nearly enough.

One issue not addressed in the legislative history of § 101(30) is whether "insider" bears the same meaning in each Bankruptcy Code section in which it is used. The term "insider" is used in more than fifteen sections of the Bankruptcy Code. *See, e.g.,* § 1129(a)(10) (prerequisites for confirmation of a plan under chapter 11); §§ 327(a) and 101(13) (conditions for trustee's employment of a professional person). In light of the many and varied uses of "insider," I conclude it is appropriate to consider the purpose of the particular statute in which the term "insider" is used.

11 U.S.C. § 547 enables a trustee to challenge pre-bankruptcy transfers of property that disrupt the equitable distribution of the property of the bankruptcy estate among similarly situated claimants according to a statutory priority of distribution. *See, House Report*, p. 178. In pursuing a judgment to avoid such transfers, a trustee ordinarily is not required to prove that the transferee knew or should have known: (1) that the transfer was preferential; (2) that the debtor was insolvent at the time of the transfer; or (3) any other pertinent factor. *Id.*

■ Prior to 1984, trustees were required to prove that an insider/transferee of a preferential transfer had reasonable cause to believe the debtor was insolvent at the time of the transfer in order to obtain a judgment avoiding and recovering the transfer. However, in 1984, Congress amended § 547 to delete this requirement. *See*, Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984); *In re Schuman*, 81 B.R. at 586–87. Thus, evidence concerning a transferee's knowledge or access to knowledge of the insolvency of the debtor, or any state of mind, is irrelevant in determining whether transfers are voidable under § 547 *or* whether the recipient is an insider. The focus of my inquiry, then, must be (1) whether Riddle had a close relationship with Debtor; (2) that resulted in a transaction that was not conducted at arm's length.

It is necessary to exercise caution in applying this test. It is possible that a creditor could coerce a transfer from a debtor by physical force or other means of intimidation. Such a transaction is definitely not made at arm's length. Nevertheless, if there was no close relationship between the transferee and the debtor then the transferee would not be an insider. *See, In re Henderson*, 96 B.R. 820, 825–26

(Bankr.E.D.Tenn.1989) (transferee's threat of criminal prosecution does not render it an insider).

**1. Riddle's Relationship to Debtor.**

It cannot be reasonably disputed that Riddle had a close relationship with Debtor at the time of Transfer. Riddle had been Debtor's general manager for years; Riddle considered Freeman, the president of Debtor, to be "family" although Freeman was no longer related by affinity; Riddle had made an unsecured loan of $25,000 relying strictly upon Freeman's word, and Riddle was in the midst of arranging the purchase of a significant portion of Debtor's operations, with the services of Debtor's attorney and several high-ranking employees. Riddle even borrowed Debtor's dba, "All Automotive Products," in naming the New Corporation. When all these facts are considered, I am impelled to find that Riddle had the kind of close relationship with Debtor contemplated by Congress.

**2. Less than Arm's Length Transaction.**

According to the testimony of Riddle and Freeman, Riddle made his loan to the Debtor because of his relationship with and trust in Freeman. I find that Freeman caused the Debtor to repay Riddle with the Transfer because of his relationship with Riddle and also because Freeman promised Riddle that Freeman would repay Riddle's loan if the Debtor did not. These facts, as well as the fact that Riddle made a significant loan on an unsecured basis and without inquiring into the Debtor's ability to repay the loan, weigh in favor of finding that the transaction between Riddle and the Debtor was not conducted at arm's length.

**3. Conclusion.**

Riddle was an "insider" within the meaning of §§ 101(30) and 547(b)(4)(B) at the time of the Transfer. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052. Trustee shall lodge a judgment consistent with this opinion within seven court days of entry of this opinion.