**In re John FOX, Debtor.**

**Louis Yoppolo, Trustee, Plaintiff,**

v.

**Charles Lindecamp, Defendant.**

**No. 00–3264.**

United States Bankruptcy Court,
N.D. Ohio.

March 22, 2002.

mary Judgment, Memorandum in Support, and Reply; and the Plaintiff/Trustee's Cross Motion for Summary Judgment, Memorandum in Support, and Memorandum in Opposition to the Defendant's Motion for Summary Judgment. This Court has now had the opportunity to review the arguments of Counsel, the exhibits, as well as the entire record of the case. Based upon that review, and for the following reasons, the Court finds that the Plaintiff's Motion for Summary Judgment should be Denied, and that the Defendant's Motion for Summary Judgment should be Granted.

### FACTS

The uncontested facts of this case show that the Defendant, Charles Lindecamp, and the Debtor, John Fox (hereinafter referred to respectively as the "Defendant" and the "Debtor"), have been very good friends since they were quite young. As a part of this friendship, both the Defendant and the Debtor share a common interest together; namely, the recreational activity of hunting and shooting. In order to further pursue these interests, both the Defendant and the Debtor began, in the late 1960's, to practice shooting on property owned by the Debtor's parents; to wit: 5 ½ acres of property located on Seminary Road in Milan, Ohio. This endeavor eventually led to the formation of a shooting club at the Seminary Road property in which an admission fee would be charged.

In addition to the shooting club, the Debtor also started his own retail gun business which he named "Firearms Unlimited." Although the exact figures were not presented to the Court, it is apparent that this business took in considerably more money than the shooting range. In fact, at its height, the facts of this case

Richard J. Szczepaniak, Toledo, OH, for Defendant.

Raymond L. Beebe, Toledo, OH, for Debtor.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court upon the Defendant/Debtor's Motion for Sum-

show that the Debtor's gun business took in over a million dollars in annual revenue. The Debtor also stated that although the revenue generated from his retail gun business was commingled with those proceeds received from the shooting range, the two businesses were run completely separately from each other. In this respect, it is clear that, except as an occasional customer, the Defendant was in no way involved in the Debtor's retail gun business.

In the years following the formation of the shooting club, which was eventually named the "Fox Rifle and Pistol Club," the Defendant became very involved in the club's development. In this regard, the evidence presented in this case clearly shows that the Defendant built most of the infrastructures (i.e., benches, a shelter and targets) at the shooting club. In addition, the Defendant handled most of the general labor activities at the shooting range. Although it appears that the Defendant put in a considerable amount of time at the shooting club, the Defendant consistently stated that he never expected to receive any compensation for his efforts. Instead, the Defendant explained that his work at the shooting club—which spanned approximately 30 years—was done "of his own initiative" and "because he liked it." (Deposition of Defendant at pgs. 37, 39).

Notwithstanding the alleged volunteer nature of the Defendant's work at the shooting range, the Defendant was initially paid, at least in part, for his work at the range. Such payments, however, ceased in 1986 when the Debtor, instead of actually paying the Defendant for his work, simply kept track of the number of hours that the Defendant spent working at the shooting range. Based upon this practice, the Debtor subsequently agreed to sign three promissory notes in favor of the Defendant: a note for Forty-nine Thousand dollars ($49,000.00) on June 1, 1990; a note for Seventeen Thousand Five Hundred dollars ($17,500.00) on January 1, 1996; and a note for Thirty-one Thousand Five Hundred dollars ($31,500.00) on January 1, 1999. These amounts, according to the Debtor, were figured based upon an hourly salary of Six dollars ($6.00) per hour. Also, during this same time frame, discussions between the Debtor and the Defendant took place regarding the exact nature of the Defendant's relationship with the shooting range business. This relationship, according to the Debtor, would involve the Defendant becoming a "partner" in the shooting range business. In addition, both the Defendant and the Debtor apparently agreed that the Defendant would receive an interest in the shooting range business, if not immediately, then out of the proceeds of the sale of the property if the property was ever sold. These agreements, however, were never formalized or otherwise placed in writing.

In 1998, individuals with property in the vicinity of the shooting range commenced a suit against the Debtor who, in 1992, had become the sole owner of the Seminary Road property. The basis for the lawsuit was that the operation of the shooting range constituted a nuisance. In direct response to the suit, the Defendant fully cooperated with the Debtor in the Debtor's efforts to win the lawsuit; for example, the Defendant, although not actually called, was to be a witness in the pending litigation. In addition, the Defendant sought to ameliorate any problems with the shooting range by making certain modifications to the Debtor's property such as fencing in the range and heightening a wall to increase the safety of the range. These efforts, however, eventually proved to be unsuccessful, when on January 11, 2000, an injunction was entered by the Common Pleas Court of Erie County, Ohio which effectively shut down the shooting range.

In addition to the above lawsuit, the Defendant, on December 9, 1999, also commenced a lawsuit against the Debtor in order to recover on those promissory notes written by the Debtor in the Defendant's favor. The Debtor, although somewhat surprised by the lawsuit, did not in any way defend in the action. In bringing the suit, the Defendant explained that he was unhappy with the way in which the Debtor was handling the state court nuisance suit. As a consequence, the Defendant related that the objective of his lawsuit was to secure his interest in the Seminary Road property, and thus recoup something for the years of work he had done at the property. At this particular juncture, it is clear that the Defendant was aware of the Debtor's deteriorating financial situation. Furthermore, the Defendant stated that by the Spring of 2000, he knew that the Debtor was contemplating filing for bankruptcy relief. In this respect, it was pointed out to the Court that the Debtor had first seen an attorney regarding bankruptcy in the fall of 1999.

On March 13, 2000, the Defendant, after having first obtained a judgment against the Debtor by default, secured a judgment lien on the Seminary Road property owned by the Debtor. Exactly 115 days later, the Debtor filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. The Plaintiff/Trustee, who is the duly appointed trustee of the Debtor's bankruptcy estate, then filed the instant Complaint to avoid the Defendant's judgment lien on the basis that its transfer to the Defendant constituted a preference within the meaning of § 547 of the Bankruptcy Code. With regards to the Trustee's cause of action under this Code section, the Parties' respective motions for summary judgment presented one issue for this Court to decide: Whether, at the time the Defendant obtained his judgment lien, the Defendant was an "insider" as that term is defined in § 101(31) of the Bankruptcy Code.

## LAW

### § 547. Preferences

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

### § 101. Definitions

(31) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control[.]

## DISCUSSION

■ Proceedings to determine, avoid, or recover a preference are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(F). Thus, this case is a core proceeding.

■ One of the primary goals of the Bankruptcy Code is to effectuate an equal distribution of the debtor's assets. *Banner v. S.S. Pierce Company (In re Pine Springs Farm & Casino, Inc.)*, 139 B.R. 90 (Bankr.N.D.N.Y.1992). Section 547 partially implements this policy by permitting the bankruptcy trustee to avoid certain transfers made during the time period immediately preceding the commencement of the debtor's bankruptcy case. The time period in which such transfers may be avoided is normally 90 days. However, when the transferee is deemed to be an "insider," as is alleged in this case, this time period is extended to one year.

■ When a debtor is an individual, § 101(31) of the Bankruptcy Code defines four different entities as insiders: (1) a relative; (2) a partnership in which the debtor is a general partner; (3) a general partner of the debtor; and (4) a corporation in which the debtor is a director, officer or person in control. In so defining these classes of entities as "insiders," the Bankruptcy Code specifically uses the word "includes" which, under the rules of construction set forth in the Bankruptcy Code, is deemed "not limiting." 11 U.S.C. § 102(3). As a result, two different categories of "insiders" exist: (1) those entities specifically meeting the statutory definition set forth in § 101(31); and (2) those entities not specifically set forth in the statute, but who have a sufficiently close relationship with the debtor so as to qualify themselves as an "insider" for purposes

of § 101(31). *See Sticka v. Anderson (In re Anderson)*, 165 B.R. 482, 484 (Bankr. D.Or.1994); *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69 (9th Cir. BAP 1991). In this case, a review of the arguments made by the Parties shows that only the latter category is at issue as nowhere is it asserted that the Defendant's relationship with the Debtor falls within one of the specifically enumerated categories set forth in § 101(31).

■ The courts addressing the issue of whether an entity, not specifically named in § 101(31), qualifies as an insider do so on a case by case basis. *Jahn v. Economy Car Leasing (In re Henderson)*, 96 B.R. 820, 825 (Bankr.E.D.Tenn.1989). As a result, a great variety of different relationships have been found to qualify as an "insider." A review of these cases, however, shows that they all have a common thread: The transferee's relationship to the debtor must be very closely analogous to those relationships specifically set forth in § 101(31) before an "insider" relationship will be found to exist. *Solomon v. Barman (In re Barman)*, 237 B.R. 342, 348–49 (Bankr.E.D.Mich.1999); *In re Henderson*, 96 B.R. at 825–26.

■ To determine whether a transferee's relationship with the debtor is sufficiently analogous to those classes of relationship specifically set forth in § 101(31), this Court has adopted, as have other bankruptcy courts, the test set forth in the legislative history of the statute which holds that an "insider" is "one who has a sufficiently close relationship with a debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *Hunter v. Dupuis (In re Dupuis)*, 265 B.R. 878, 885 (Bankr. N.D.Ohio 2001); *Hunter v. Pool Pals Mfg., Inc. (In re Benson)*, 57 B.R. 226, 230 (Bankr.N.D.Ohio 1986); *In re Babcock*

*Dairy Co. of Ohio, Inc.,* 70 B.R. 662, 667 (Bankr.N.D.Ohio 1986); H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 312 (1977), reprinted in U.S.Code Cong. & Admin.News, 1978, pp. 5787, 5963, 6269. In support of his compliance with this test, the Trustee bases his argument on the cumulative effect of all of the circumstances present in this case; of particular importance in this regard, the Trustee called the Court's attention to the following points: (1) the Debtor and the Defendant were good friends; (2) the Defendant, on many occasions, declined to receive immediate remuneration from the Debtor; (3) the Defendant, during the time the nuisance suit against the Debtor was proceeding, used his best efforts to protect the shooting club business; (4) the Defendant only filed his lawsuit against the Debtor when he realized that other parties would potentially gain an interest in the Seminary Road property; (5) the Debtor and the Defendant had discussions involving the Defendant's relationship with the shooting range; (6) the Defendant was aware of the Debtor's deteriorating financial condition at the time he filed his lawsuit; and (7) the Defendant was aware that the Defendant would be filing for bankruptcy at the time he perfected his judgment liens.

■ Unequivocally, the above points made by the Trustee raise a serious question as to whether the Defendant and the Debtor conducted their transactions at arm's length; an arm's length transaction may be said to occur when a transaction is conducted in the ordinary course of business by parties with independent interest. BLACK'S LAW DICTIONARY 109 (6th ed.1990). However, whether a transaction was conducted at arm's length is not, for "insider" purposes, completely dispositive of the issue. For example, even though friends can rarely be said to conduct transactions at arm's length, it is clear that the mere existence of a friendship will not result in the creation of an "insider" relationship. *Pfeiffer v. Thomas (In·re Reinbold),* 182 B.R. 244, 246·(D.S.D.1995); *see also Huizar v. Bank of Robstown (In re Huizar),* 71 B.R. 826, 831–32 (Bankr.W.D.Tex.1987) (long-standing personal friendship and business relationship between bank officer and debtor did not render bank an insider for preference purposes). Similarly, a normal creditor-debtor relationship does not give rise to an "insider" relationship despite the fact that the creditor may have confidential knowledge of the debtor's financial condition. *See Damir v. Trans–Pacific Nat'l Bank (In re Kong),* 196 B.R. 167, 171 (N.D.Ca.1996) (normal creditor-debtor relationship does not give rise to insider relationship). Instead, an equally important factor pertaining to a transferee's status as an "insider" concerns the closeness of the transferee's relationship to the debtor. *Miller v. Schuman (In re Schuman),* 81 B.R. 583, 586 (9th Cir. BAP 1987) (the test developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor).

■ In determining the closeness of a transferee's relationship with a debtor, the essential question is not how well the parties know each other, but instead, the degree to which the transferee is able to exert a significant amount of control or influence over the debtor. *In re Dupuis,* 265 B.R. at 885. Stated in another way, an insider relationship will only be found to exist when the relationship between the transferee and the debtor was such that the transferee had the power to pressure the debtor so as to have its debt paid at the expense of a debtor's other creditors. *In re Kong* 196 B.R. at 171.

In this case, in addressing the closeness of the relationship between the Defendant

and the Debtor, it is first observed that when the Debtor's financial condition was deteriorating, his primary concern was, in all likelihood, his retail gun shop—which could reach a million dollars a year in revenue—and not the shooting range which took in considerably less money. The facts of this case, however, clearly show that the Defendant was in no way involved in the retail gun shop, thus raising a serious question regarding the extent to which the Defendant's involvement in the shooting range could influence those matters relating to the Debtor's financial affairs. Along this same line, it appears that what control and influence the Defendant may have had over the Debtor as a result of their friendship deteriorated greatly in the couple of years immediately preceding the filing of the Debtor's bankruptcy petition. For example, the Defendant admits that, although he was not satisfied with the way in which the Debtor was handling the nuisance action, he had no control over the way in which the suit was defended. Similarly, despite the alleged closeness of the relationship between the Debtor and the Defendant, the Debtor admits that he was somewhat surprised by the Defendant's lawsuit.

More revealing, however, concerning the extent of control the Defendant exercised over the Debtor is this particular fact: the Debtor, despite acknowledging that he was obligated on the promissory notes he had written in the Defendant's favor, nevertheless forced the Defendant to bring a lawsuit, instead of just simply granting the Defendant a mortgage on the Seminary Road property. Although the involuntary nature of a transfer does not, in substance, negate a preference action, the Court finds it highly unlikely that a person with a significant amount of influence and control over a debtor would need to effectuate an involuntary transfer of property. Also revealing in this regard is that two of the promissory notes written in the Defendant's favor were done well before there was any indication of any financial difficulties with the Debtor.

Further pointing against the existence of any "insider" relationship, is the fact that rather than maintaining an actual business relationship with the Debtor, the Defendant's relationship with the shooting range business seems to have been that of a hobby, or, at the very most, that of an employee. The significance of this is that if a true business relationship had been intended, then it would follow that the Defendant would have been involved (even if just a little) with if and when the Debtor would file for bankruptcy relief. In this respect, it is noted that three out of the four entities specifically defined as "insiders" are based upon the existence of a true business relationship. *See discussion, supra.* In concluding that a true business relationship between the Debtor and the Defendant was not actually intended, these observations can be made: (1) the Defendant, despite putting in literally thousands of hours worth of work at the shooting range, never entered into an actual business agreement with the Debtor; (2) the Defendant stated that his work at the shooting range would have been performed regardless of any remuneration; (3) the Defendant's pay from his work at the shooting range was calculated based upon an hourly rate as opposed to a percentage of the profits; (4) no evidence exists that the Defendant claimed any gains or losses from the shooting range business on his income tax returns; and (5) no evidence exists that the Defendant was involved in any decisions regarding the management of the shooting range business.

Thus, based upon the above considerations, the Court is not satisfied that there exists sufficient evidence to find that the Defendant had the ability to influence and

control the Debtor's financial affairs. Therefore, despite the fact that the Defendant and the Debtor did not conduct their financial transactions at completely arm's length, the Court holds that the Defendant was not, with respect to his lawsuit against the Debtor, acting as an "insider" as that term is defined in 11 U.S.C. § 101(31). In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the Motion for Summary Judgment submitted by the Plaintiff/Trustee, Louis Yoppolo, be, and is hereby, DENIED; and that the Motion for Summary Judgment submitted by the Defendant, Charles Lindecamp, be, and is hereby, GRANTED.