In re A. TARRICONE, INC., Debtor.

Hal M. Hirsch, as Chapter 11 Examiner of the Estate of A. Tarricone, Inc., Debtor, Plaintiff,

v.

Virginia Tarricone, Cimmaron Dist., Inc., Majac Enterprises, Inc., Vincent Giagni, Don Tarricone, and Tarricone Fuel Service, Inc., Defendants.

Bankruptcy No. 97 B 21488(ASH).
Adversary No. 99–5322A.

United States Bankruptcy Court,
S.D. New York.

March 14, 2002.

Gainsburg & Hirsch LLP, By Eric H. Lindenman, Esq., New York City, for Plaintiff.

Leahy, Nyberg, Curto & D'Apice, By Michael J. Curto, Esq., Yonkers, NY, for Defendant Vincent Giagni.

### DECISION AFTER TRIAL

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

This adversary proceeding was brought by Hal M. Hirsch as Chapter 11 Examiner (the "examiner") of debtor A. Tarricone, Inc. ("debtor" or "ATI") to recover preferences from certain alleged "insiders" of ATI. The only defendant remaining in the adversary proceeding is Vincent Giagni ("Giagni"), all other claims having been settled. After denial of a motion for summary judgment, the examiner's claim against Giagni was tried to the Court, and the following constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

The principal issue was whether Giagni was a so-called non-statutory insider of the debtor for purposes of the one-year preference recovery period for insiders in 11 U.S.C. § 547(b)(4)(B). I conclude that he was.

### Jurisdiction

This Court has jurisdiction over the debtor's Chapter 11 case by reason of 28 U.S.C. §§ 1334(a) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

### Background

At all material times ATI was a New York corporation engaged in the business of storing and distributing propane, fuel oil and gasoline. From 1981 to 1992 the company was solely owned and operated by Arthur Tarricone ("Tarricone"), who was its president. This is ATI's second bankruptcy case. ATI's first bankruptcy was filed in 1986 and resulted in confirmation of a plan of reorganization in 1989.

In 1992 Tarricone was indicted on various charges relating to tax fraud. At that time Tarricone divested himself of all his ATI stock, by redemption to ATI and by transfers to his three grown children. One child, Claire Tarricone, became President of ATI and remained so through ATI's present bankruptcy. During the relevant time period, all three Tarricone children worked at ATI. There is no evidence to show that Tarricone was an officer, director, shareholder or employee of ATI after November 1992. The examiner, however, contended that Tarricone remained the *de facto* head of ATI and controlled ATI as father of the sole shareholders and managers, and as pledgee of all of their stock. As amplified below, whether or not Tarricone could or did exercise "control" over ATI after 1992 by reason of his parental relation to his children who ran ATI or as pledgee of all outstanding shares of ATI is irrelevant. There is no question that Tarricone was a statutory insider of ATI under 11 U.S.C. § 101(31)(B)(vi).

Giagni, semi-retired since 1985 and living part-time in Greenwich, Connecticut, and part in Florida, was a very successful

businessman. He was engaged in two different types of business. One was electro-mechanical manufacturing of precision instrumentation for military, computer and medical applications; the other was manufacture of electronic hardware for the computer industry. He operated his business interests through a number of separate corporate entities of which he was the president, chief operating officer and sole shareholder. In operating his various businesses, he had occasion to borrow money and also to extend credit to customers, and he was obviously experienced in financial matters. Observing Giagni's testimony and demeanor, there is no question that he was and is a sophisticated and knowledgeable businessman with a commanding personality borne of intelligence, long experience and success.

Tarricone and Giagni have been close personal friends. The two were introduced in 1981 at the Knollwood Country Club in Westchester County and have dined and golfed together ever since, sometimes as often as once a week, in Westchester and in Florida where both maintained residences. They continue to socialize regularly. Giagni attended the weddings of Tarricone's children and is familiar with members of the Tarricone family.

Giagni was never an officer, shareholder or employee of ATI. However, because of the close personal relationship between the two men Giagni acted as a business or financial counselor to Tarricone in connection with ATI's first bankruptcy and served on ATI's Board of Directors at least from May 1988 until October 1990.

In December 1995 Giagni made a loan of $200,000 to ATI. The loan was made at Tarricone's personal request. Loan documents were drawn up by Giagni's attorney, Michael Curto ("Curto"), and consisted of a promissory note, a security agreement, a

UCC–1 financing statement and personal guarantees of Tarricone and Claire Tarricone. Curto obtained from Claire Tarricone a list of aged accounts receivable of ATI aggregating $577,000. The loan had a term of 39 days and accrued interest at 8.5% per annum, which was the prime rate at the time. The UCC–1 financing statement was filed in Westchester County and was mailed to the New York Secretary of State but was never filed or recorded by the Secretary of State as required by N.Y. U.C.C. § 9–401(1)(c), and therefore was not perfected.

The loan was not repaid on time, but was eventually paid in full. About four months after the loan was made, ATI repaid Giagni $100,000. On June 28, 1996, ATI made a second payment of $100,000 to Giagni, the payment at issue here, and on May 15, 1997 it paid him $3,155.71 in interest, which the examiner also seeks to recover.

On June 10, 1997 ATI filed for protection pursuant to Chapter 11 of the United States Bankruptcy Code (the "Code"). The debtor's schedules listed assets of approximately $3.4 million and liabilities of $17.2 million, including taxes of $8.7 million.

### Discussion

Section 547 of the Bankruptcy Code, entitled "Preferences," provides generally that "the trustee may avoid" transfers by a debtor to or for the benefit of a creditor on account of an antecedent debt within 90 days before the debtor's bankruptcy filing, or within one year before filing if the creditor was an insider of the debtor. Section 550(a), entitled "Liability of transferee of avoided transfer," permits the trustee to recover the full amount of property transferred that is avoidable as a preference under Section 547.

The avoidance and recovery of preferences under Sections 547 and 550 are among the extraordinary provisions of the Bankruptcy Code. They empower the court to require a creditor to repay to the debtor's estate the full amount of prepetition payments which the debtor lawfully made to the creditor on account of a debt justly due and owing—payments which the debtor was entitled (indeed, obligated) to make and which the creditor was entitled to receive and keep under contract and state law. In exchange for the dollar-for-dollar repayment to the trustee, the creditor gets only a claim against the debtor's estate which may be worth pennies on the dollar.

■ The fundamental objective of preference recovery is the fair and equitable distribution among creditors of the debtor's limited assets. To this end, Congress provided in Section 547 that all payments of antecedent debts by an insolvent debtor within 90 days of filing for bankruptcy should be returned to the debtor's estate for *pro rata* distribution among all creditors. In addition, the avoidance power may serve to blunt individual creditors' incentive to effectively dismember a financially troubled obligor by the proverbial "rush to judgment." As colorfully expressed by the Seventh Circuit in *Levit v. Ingersoll Rand Financial Corporation, et al.*, 874 F.2d 1186 (7th Cir.1989) (hereinafter *Deprizio*):

> Payments out of the ordinary course in the 90 days before filing a bankruptcy petition may be recovered for the estate under §§ 547 and 550. Creditors then receive shares determined by statutory priorities and contractual entitlements rather than by their ability to sneak in under the wire. (874 F.2d at 1188)

> Any individual creditor has a strong incentive to make off with the assets of a troubled firm, saving itself at potential damage to the value of the enterprise. Many a firm is worth more together than in pieces, and a spate of asset-grabbing by creditors could dissipate whatever firm-specific value the assets have. . . . All creditors gain from a rule of law that induces each to hold back. The trustee's avoiding powers serve this end in two ways: first, they eliminate the benefit of attaching assets out of the ordinary course in the last 90 days before the filing, so that the rush to dismember a firm is not profitable from a creditor's perspective; second, the avoiding powers assure each creditor that if it refrains from acting, the pickings of anyone less civil will be fetched back into the pool. (*Id.* at 1194)

■ In the case of creditors who are insiders of the debtor, the preference period is extended from 90 days to one year prior to filing. Simply stated, the reason for the extended preference period is that insiders are far more likely to be given preferential treatment in debt repayment than creditors who deal with the debtor at arm's length. In addition, insiders have the power to influence or even control the date of filing for bankruptcy in relation to the dates of repayment to themselves. To quote again from the Seventh Circuit in *Deprizio:*

> Insiders pose special problems. Insiders will be the first to recognize that the firm is in a downward spiral. If insiders and outsiders had the same preference-recovery period, insiders who lent money to the firm could use their knowledge to advantage by paying their own loans preferentially, then putting off filing the petition in bankruptcy until the preference period had passed. . . . With a long [preference recovery] period for insiders, even the prescient managers who first see the end coming are

unlikely to be able to prefer themselves in distribution. (*Id.* at 1195)

Section 547(b) presents five criteria which are to be applied to a transfer of property of the debtor and provides that the Trustee (or, in this case, the examiner) may avoid any transfer of property of the debtor which satisfies all five. The criteria are: (1) the transfer must have been to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) made while the debtor was insolvent, (4) on or within ninety days before the date of the filing of the petition, or within one year before the date of the filing if the creditor was an insider at the time of the transfer, and (5) which enabled the creditor to receive more than he would have received under the distribution provisions of the Code. 11 U.S.C. § 547(b)(1–5).

■ With respect to these five criteria, there is no question that the two transfers here in dispute (1) were made to Giagni, then a creditor of ATI, (2) on account of an antecedent debt and (4) within one year before the date of ATI's filing under Chapter 11. With respect to criterion (5), Giagni asserted in the Joint Pretrial Order that because he was a secured creditor the transfers did not result in Giagni's receiving more than he would have received as an unsecured creditor under Chapter 7. However, Giagni has not taken issue with the examiner's position that his UCC–1 financing statement was not recorded as required in the office of the New York Secretary of State. Accordingly, ATI's indebtedness to Giagni was unsecured because it was unperfected, and for the further reason that ATI had no unsecured assets to which Giagni's alleged lien could attach.

Thus, at the trial the examiner was required to prove (3) that ATI was insolvent on June 28, 1996 and May 15, 1997 when it made payments to Giagni of $100,000 and $3,155.71, respectively, and (4) that on June 28, 1996 Giagni was an "insider" as to the $100,000 payment. The $3,155.71 payment was made within ninety days of ATI's filing and, thus, was a preference if ATI was then insolvent whether or not Giagni was an insider.

## I. *Insolvency*

Little need be said on the issue of whether ATI was insolvent at the time of the transfers to Giagni. The examiner's case on this point was presented by Andrew W. Plotzker, a certified public accountant. Plotzker's testimony on the question of insolvency appears at pages 52–65 of volume 1 of the trial transcript (hereafter "Vol. I Tr."). Cross-examination and questions by the Court did nothing to undermine or raise any doubt whatever concerning Plotzker's testimony on any issue, and Giagni presented no counter-evidence on the issue of insolvency. Plotzker's testimony demonstrated that ATI was insolvent at least as early as, and at all times after, August 31, 1995. Plotzker's testimony was lucid, fully documented and thoroughly credible in every respect.

I find the facts respecting ATI's solvency to be as stated by Plotzker in his testimony and conclude as a matter of fact and law that ATI was insolvent at the time of Giagni's loan to ATI and all of ATI's transfers to Giagni.

## II. *Insider status*

### A. *Governing law*

#### 1. *General principles*

Section 547(b)(4)(B) provides for avoidance of transfers within one year before the date of filing if the creditor "at the time of such transfer was an insider." The

term "insider" is defined in relevant part in Section 101(31)(B) as follows:

(31) "insider" includes—

\* \* \* \* \* \*

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer or person in control of the debtor;

■ Persons specified in the six subdivisions of Section 101(31)(B) are generally referred to as "statutory" insiders. But in providing that the term insider *"includes"* the statutory insiders, Congress made clear that "insider" is not limited to these six categories. Thus, the statutory list is not exhaustive, and it is for the courts to define the limits of non-statutory insider status. *See, e.g., Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69–71 (9th Cir. BAP 1991); *Badger Freightways, Inc. v. Continental Illinois National Bank (In re Badger Freightways, Inc.)*, 106 B.R. 971, 980 (Bankr.N.D.Ill.1989); *Rush v. Riddle (In re Standard Stores, Inc.)*, 124 B.R. 318, 324 (Bankr.C.D.Cal.1991); *Hunter v. Babcock (In re Babcock Dairy Co. of Ohio)*, 70 B.R. 662, 666 (Bankr.N.D.Ohio 1986); *Schreiber v. Stephenson (In re Emerson)*, 235 B.R. 702, 706 (Bankr.D.N.H. 1999) (hereinafter *"Emerson II"*); *Sticka v. Anderson (In re Anderson)*, 165 B.R. 482, 485 (Bankr.D.Or.1994).

■ In determining whether a person is a non-statutory insider, courts have generally focused on two basic factors: (1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. *Emerson II*, 235 B.R. at 707. *See also In re Krehl*, 86 F.3d 737, 742 (7th Cir.1996); *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1010–11 (5th Cir.1992); *In re Friedman*, 126 B.R. at 70; *Meyer v. Dygert (In re Dygert)*, 2000 WL 630833, at *7 (Bankr.D.Minn. May 11, 2000); *Torcise v. Cunigan (In re Torcise)*, 146 B.R. 303, 305 (Bankr.S.D.Fla. 1992); *In re Standard Stores, Inc.*, 124 B.R. at 324; *Castellani v. Kohne (In re Kucharek)*, 79 B.R. 393, 395 (Bankr. E.D.Wis.1987); *Grant v. Podes (In re O'Connell)*, 119 B.R. 311, 316 (M.D.Fla. 1990). *But see* Alec P. Ostrow, *Insider "Includes"? Include Me Out*, 7 Am. Bankr.Inst. L.Rev. 601 (1999) ("[i]f I am to be sued for an insider preference, I would expect that my jury would be asked to find that my relationship with the debtor shares so many attributes with one of the enumerated relationships that it would be viewed, more likely than not, by a reasonable person as essentially the same thing"). This test was derived from the legislative history of Section 101(31), which stated that: "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor." S.Rep. No. 95–989, 2d Sess., at 25 (1978), reprinted in COLLIER ON BANKRUPTCY, Appendix D, Part 4(e)(i) at 4–1957 (Lawrence P. King et al. eds., 15th ed. rev.2001). *See also* H.R.Rep. No. 95–595, 1st Sess., at 312 (1977), U.S.Code Cong. & Admin.News 1977, pp. 5787, 5963.

The analysis is a fact intensive one and must be done on a case-by-case basis. *In re Chas. P. Young Co.*, 145 B.R. 131, 136 (Bankr.S.D.N.Y.1992); *Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206, 210 (5th

Cir.1983); *Emerson II*, 235 B.R. at 706; *Three Flint Hill Limited Partnership v. The Prudential Insurance Company (In re Three Flint Hill Limited Partnership)*, 213 B.R. 292, 298 (D.Md.1997), *aff'd*, 103 F.3d 120 (4th Cir.1996); 2 COLLIER ON BANKRUPTCY ¶ 101.31, at 101–101 ("[w]hether or not an individual or entity will qualify as an insider is a question of fact"). A non-exclusive list of some of the factual elements that courts have looked to in making the determination of whether a transferee is a non-statutory insider appears in *Emerson II*, 235 B.R. at 707.

To summarize, the task of this Court is to examine all of the evidence and to determine, based upon the particular facts in this case, whether Giagni's loan to ATI and its repayment within one year prior to ATI's bankruptcy filing was a commercially-motivated, arm's length transaction. If it was not, the Court must subject the loan and its repayment "to closer scrutiny than those dealing at arm's length with the debtor" and must determine whether the relationship of the parties was of such a nature as to warrant a determination of non-statutory insider status by analogy to the statutory definitions in Section 101(31)(B)(i)—(vi) and application of the principle of *ejusdem generis*.

Before turning to an assessment of the facts in light of the governing legal principles, it will be useful to consider two legal arguments which are central to Giagni's defense, and certain legal points relating to the significance of Claire and Arthur Tarricone's personal guarantees of ATI's debt to Giagni.

## 2. *The insider-debtor relationship*

■ First, Giagni asserts that his close, personal relationship was with Tarricone, and that he had no relationship with ATI (other than his creditor relationship, of course). Thus, Giagni argues as a point of law that to recover on a preference claim the trustee (here, the examiner) must prove that the defendant-creditor had a close relationship with *the debtor*, and not merely a personal relationship with a statutory insider of the debtor.[1] The argument is refuted by the statute itself and has been rejected in the case law.

Congress did not limit the definition of "insider" to persons having a direct relationship (in addition to the debtor-creditor relationship) with the debtor. Since Congress listed as statutory insiders those persons with a direct relationship to the debtor (*i.e.*, officers, directors and controlling shareholders), it cannot be supposed that non-statutory insiders must also have a direct relationship redundant of what is already in subsections (i)—(vi). Moreover, Section 101(31)(B)(vi) expressly extends insider status to persons who have no formal relationship at all with the corporate debtor, namely, relatives of insiders. Having provided that statutory insiders like relatives need have no direct relationship to the debtor, there is no reason to suppose that Congress intended a different rule for non-statutory insiders.

Courts have held that creditors with *no* direct relationship with the debtor (other than as creditor) may be deemed non-

---

1. Giagni's argues in his Pre–Trial Memorandum: "Mr. Giagni's *only* affiliation with the Debtor was his being appointed to the Board in or about May 1989.... [which] lasted until October 10, 1990, when he formally resigned.... Any alleged relationship between Mr. Giagni and the Debtor was through Mr. Tarricone; thus Mr. Giagni was one person removed from the Debtor. Therefore, from 1987 to 1995, the year of the Loan, Mr. Giagni had *no* close relationship with the Debtor that would require this Court to carefully scrutinize the parties [sic] conduct." Pre–Trial Memorandum at 10, emphasis in original.

statutory insiders by virtue of their close personal relationship with persons who are statutory insiders. *See Three Flint Hill Limited Partnership v. The Prudential Insurance Company*, 213 B.R. at 300–01 (in a case involving relationship between one who controls the transferee and one of the general partners of the debtor, the court concluded that "insider status may be based on a 'professional or business relationship with the debtor,' where the conduct of the creditor or the debtor is 'attributable simply to affinity rather than to the course of business dealings between the parties' ") (quoting *Friedman, supra*, 126 B.R. at 70); *Loftis v. Minar (In re Montanino)*, 15 B.R. 307, 309–11 (Bankr. D.N.J.1981) (parents of the debtor's fiancée deemed non-statutory insiders by reason of their relationship with their daughter and their daughter's close "affinity" with the debtor [2]). In such cases the affinity with an insider is the explanation for the non-arm's length, preferred relationship between the creditor and the debtor. Giagni has cited no case holding that some formal relationship with the debtor, as opposed to personal relationships with the debtor's insiders, is a prerequisite for non-statutory insider status.

### 3. *Control not necessary*

■ Second, Giagni argues that the examiner has not proven that either he or Tarricone had the capacity to exercise "control" over ATI, and that a finding of control is necessary for a determination that he was a non-statutory insider, citing *Pfeiffer v. Thomas (In re Reinbold)*, 182 B.R. 244 (D.S.D.1995), *Thrush v. Marvin (In re Hollar)*, 100 B.R. 892 (Bankr. S.D.Ohio 1989) and *In re Badger Freightways, Inc.*, 106 B.R. at 982. Once again, neither the statute nor the case law supports Giagni's position.

Turning first to Tarricone, as discussed earlier the basis of his status as an insider is statutory under Section 101(31)(B)(vi) as a "relative of a[n] . . . officer, or person in control of the debtor." There is nothing in the statute or in the case law to suggest that an additional finding of control is required after an individual has been held to satisfy one of the enumerated categories in the statute.

Where Congress intended control to be an element in determining insider status, it was specified in the statute. Only two of the sub-categories in Section 101(31) require a finding of control by the person who is to be held an insider. *See* Section 101(31)(B)(iii) and (C)(v). It is self-evident that most directors (subsection (i)) and subordinate officers (subsection (ii)) of the debtor do not exercise "control" over the debtor, much less do relatives of officers and directors (subsection (vi)). Nor is it necessary to find that a statutory insider with whom a creditor has a close personal relationship (in this case, Tarricone) has a position of control over the debtor. If it were not abundantly clear from subsections (i)—(v), only one of which requires control, the disjunctive in subsection (vi) denominating as an insider a relative of a general partner, officer, director "*or* person in control of the debtor" puts it beyond argument that Congress did not make con-

---

**2.** *In re Montanino* has been criticized for stating that the affinity between the debtor and his fiancée "falls within the definition of relative as provided in § 101(34) [now Section 101(45)] of the Code," 15 B.R. at 310. *In re McIver (Freund v. Heath)*, 177 B.R. 366, 368 (Bankr.N.D.Fla.1995). While the court in *Montanino* appears to have erred in charac-terizing the fiancée as a "relative" within the definition in Section 101(45), the close affinity between prospective parents-in-law and their daughter's betrothed would certainly justify a finding of non-statutory insider status in a transaction between a debtor and his fiancée's parents which was not at arm's length.

trol necessary for either statutory or non-statutory insider status. The nature of the relationships listed in all of the subparts of Section 101(31) are such that influence can be assumed, and it is therefore unnecessary to prove that there is actual control if such a relationship has been established. *See, e.g., In re Friedman,* 126 B.R. at 69–70 ("The Code assigns insider status to [those] . . . whose affinity or consanguinity gives rise to a conclusive presumption that the individual . . . commands preferential treatment by the debtor").

Giagni incorrectly cites *In re Reinbold* as "requiring 'control' to be present for [a] finding of insider." The bankruptcy court in *Reinbold* relied primarily upon a two-prong test, described as the *"In re Standard Stores* test," referring to *In re Standard Stores, Inc.,* 124 B.R. 318 (Bankr. C.D.Cal.1991), one of the many cases cited above in which courts have crafted a test based upon the legislative history of Section 101(31). The *Reinbold* court affirmed the bankruptcy court's analysis under the *Standard Stores* test, in which it held that the transferee had a sufficiently close relationship with the debtor to merit closer scrutiny, but that the transfer in question was made at arm's length. (*Id.,* 182 B.R. at 246–47) The district court in *Reinbold* then proceeded to review the bankruptcy court's "control" test. The district court's analysis, upon which Giagni relies, is brief enough to set forth here in its entirety:

> The third test the trial court refers to is "control." Control has been defined as the creditor dominating the debtor. *In re Hyperion Enterprises, Inc.,* 144 B.R.

228, 235 (Bankr.D.R.I.1992) (quoting *In re Int'l Club Enterprises, Inc.,* 109 B.R. 562, 565 (Bankr.D.R.I.1990)). As the trial court found, that kind of control is missing in the instant case. (*Id.* at 247)[3]

Ironically, the facts of *Standard Stores,* the case relied upon in *Reinbold,* bear a remarkable similarity to those in the case at bar. In *Standard Stores,* the bankruptcy court held that the defendant, Riddle, a former general manager of the corporate debtor, was a statutory insider due to (1) his close relationship with Freeman, the president of the debtor, and (2) the fact that Riddle made an unsecured loan of $25,000 relying solely on Freeman's promise of repayment. (124 B.R. at 325) The court concluded:

> I find that Freeman caused the Debtor to repay Riddle . . . because of his relationship with Riddle and also because Freeman promised Riddle that Freeman would repay Riddle's loan if the Debtor did not. These facts, as well as the fact that Riddle made a significant loan on an unsecured basis and without inquiring into the Debtor's ability to repay the loan, weigh in favor of finding that the transaction between Riddle and the Debtor was not conducted at arm's length. (*Id.*)

Nor do the other two cases cited by Giagni support his position. *In re Hollar* cites the legislative history test used in *Standard Stores* and concludes that given the only fact presented—that the defendant was the "girlfriend and future fiancee

---

**3.** In *In re Hyperion Enterprises,* cited by *Reinbold,* the court stated that it had held that a 50% stockholder of a closely-held corporation was an insider where there was "very strong evidence that the 50% stockholder dominated the debtor 'virtually from the moment it opened for business,' " that "such 'control' is a classic ground for defining one an insider,"

and declined to hold that a 25% stockholder was an insider under the same rationale. *In re Hyperion Enterprises,* 144 B.R. at 235 (internal citation omitted). *In re Hyperion* states nothing more than the truism that control is a "classic ground" for defining a person as a statutory insider.

of the debtor at the time of the transfer"—the court could not determine that the relationship was "of such a nature as to make Defendant an insider." *In re Hollar,* 100 B.R. at 893. *In re Badger Freightways* involved a quite different set of facts than that presented here. The creditor in that case was an institutional lender, Continental Illinois National Bank and Trust Company of Chicago, whose fundamental relationship with the debtor was commercial and arm's length. The only basis on which Continental could be deemed an insider was if it exercised control over the debtor, and it was in this context that the court stated:

> When describing the requisite level of influence the lender must have to be an insider, courts have used terminology such as having a "stranglehold" over the debtor, having "complete domination" of the debtor, rendering the debtor a "mere instrumentality or alter ego" of the lender or "powerless to act independently." (*Id.* at 981–82, citations omitted)

By contrast, the creditor here, Giagni, is an individual and his relationship to ATI was neither commercial nor arm's length, but was based solely on his close, personal relationship with Tarricone. An insider relationship with a debtor by an individual such as Giagni on one hand, and a lending institution such as the one described in *In re Badger Freightways* on the other, must obviously be manifested in different ways. *See* 2 COLLIER ON BANKRUPTCY ¶ 101.31, at 101–101 (noting "different manners in which a person may be 'sufficiently close' or a 'controlling interest' "). The "control" test articulated in *Badger*

*Freightways* is appropriate in a case involving a bank or other institutional lender where control is the sole basis for a finding of insider status. But the control test is neither appropriate nor relevant in a case where a finding of insider status is not predicated on control but on a close, personal relationship between individuals and facts evidencing that the transaction was not at arm's length.

Courts in this circuit have taken the view that "[a] creditor who does not deal at arms [sic] length with the debtor, but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider." *DeRosa v. Buildex Inc. (In re F & S Central Man. Corp.),* 53 B.R. 842, 848 (Bankr.E.D.N.Y. 1985); *see also Rubin Bros. Footwear, Inc. v. Chemical Bank (In re Rubin Bros. Footwear, Inc.),* 73 B.R. 346 (S.D.N.Y. 1987) (voting control is not the only means of reaching insider status under Section 101(31)).[4]

### 4. *Legal aspects of personal guarantees*

■ In my decision denying the examiner's motion for summary judgment, I solicited the parties' legal positions on the question whether the existence of the personal guarantees of the ATI debt to Giagni given by Claire and Arthur Tarricone is a factor which may or should be considered by the Court in determining whether Giagni should be deemed a non-statutory insider. The question was posed to counsel specifically in the context of the *Deprizio* decision, 874 F.2d 1186, *supra,* and the

---

4. *In re Coin Phones,* 153 B.R. 135 (Bankr. S.D.N.Y.1993) is not inconsistent with this view. In that case the court granted a motion to dismiss a complaint to recover alleged preferences stating that it did not want to expand the definition of "insider" and subject a

"large pool of individuals to preference actions." *Id.* at 141. The Court did not reject the notion of non-statutory insiders; rather, it simply held that the facts alleged did not support such a determination.

Bankruptcy Reform Act of 1994 amendment to Section 550 of the Bankruptcy Code (by adding a new subsection (c)) which was meant to overrule part of the result reached in *Deprizio*. I conclude (1) that neither *Deprizio* nor amended Section 550(c) bears upon the issue presented here, and (2) that the existence of personal guarantees issued by insiders for the benefit of the recipient of repayment of an antecedent debt within one year prior to a bankruptcy filing is a factor which should be considered by the bankruptcy court in determining whether the recipient should be deemed a non-statutory insider for preference purposes under Section 547.

Part III of the decision in *Deprizio* addressed the following question: "whether the Trustee may recover from an outside creditor under § 550(a)(1) a transfer more than 90 days before the filing that is avoided under § 547(b) because of a benefit for an inside creditor." (874 F.2d at 1194) The "benefit for an inside creditor" in *Deprizio* was the elimination of the contingent liabilities of insiders on their personal guarantees of antecedent debts owing by the corporate debtor to outside creditors which were paid by the debtor within one year prior to filing. The Seventh Circuit was the first Court of Appeals to rule upon this question, which had sharply divided the lower courts. After a lengthy analysis, including a review of the divided case law and commentators, the Seventh Circuit held in *Deprizio* "that the preference-recovery period for outside creditors is one year when the payment produces a benefit for an inside creditor, including a guarantor." (874 F.2d at 1200–1201) As a consequence, the trustee was permitted to recover payments to "outside" creditors during the full one year period applicable to insiders in repayment of debts guaranteed by insiders.

This result in *Deprizio* was effectively overruled by Congress in the Bankruptcy Amendments Act of 1994, which added a new subsection (c) to Section 550 providing as follows:

 (c) If a transfer made between 90 days and one year before the filing of the petition—

 (1) is avoided under section 547(b) of this title; and

 (2) was made for the benefit of a creditor that at the time of such transfer was an insider;

 the trustee may not recover under subsection (a) from a transferee that is not an insider.

(*See* 5 COLLIER ON BANKRUPTCY ¶ 547.03[3][a], at 547–32.)

Neither *Deprizio* nor the amendment to Section 550 concerns the question at issue here, which is whether Giagni should be deemed a non-statutory insider for preference purposes. In *Deprizio* it was conceded that the creditors who received the payments within one year of filing were *not* insiders. Thus, as stated by the Court of Appeals the question concerned "whether payments to creditors *who dealt at arm's length with a debtor* ..." (874 F.2d at 1187), and "whether the Trustee may recover from an *outside creditor* ..." (*id.* at 1194), and the Court's holding was that the preference-recovery period "for *outside* creditors is one year" (*id.* at 1201, emphasis supplied in each quotation). Similarly, amended subsection (c) of Section 550 provided that the trustee may not recover under Section 550(a) "from a transferee that is *not an insider*" (emphasis supplied).

The issue in this case is not whether the one-year preference period applicable to insiders should be applied to *outside* creditors, as in *Deprizio*, in violation of the amended version of Section 550(c). The question here is whether a particular cred-

itor, Giagni, *is an insider* within the meaning of Section 101(31)(B) and the case law, to whom the one-year preference recovery period under Section 547(b)(4)(B) was intended to apply. That issue requires a fact-intensive, case-by-case analysis, and the existence or not of personal guarantees by insiders, whose personal liability may be reduced by payments to the creditor from the corporate debtor, is a relevant part of the factual matrix.

Personal guarantees of corporate debts by one or more corporate principals are common in lending to closely-held corporations. Typically, a bank lending money to a family-owned corporation will require a personal guarantee from the sole or controlling shareholder and, often, his or her spouse.

Personal guarantees of corporate debt by insiders enhance the likelihood that a lender will be repaid in two respects. First, the prospect of personal liability for the corporate obligation burdens the insider with a powerful incentive to use his or her influence to ensure that scarce corporate funds will be used to pay the guaranteed party ahead of other creditors so as to avoid personal liability. Second, if the corporate debtor fails to repay the loan, the lender may have recourse to the guarantors' personal assets, if any exist.

The existence of personal guarantees by insiders does not by itself justify a conclusion that the guaranteed creditor is a non-statutory insider, particularly where there is no evidence that the debtor-creditor relationship was not commercial and arm's length, as in the case of a normal bank loan. But where circumstances raise a question as to the arm's length nature of the loan transaction, the existence of insider guarantees is probative evidence on the question whether the Court should find that the word "includes" in Section 101(31)(B) is broad enough to include the guaranteed lender as a non-statutory insider.

### B. *The facts in this case*

The particular facts in this case demonstrate quite clearly that Giagni's loan to ATI did not constitute a commercially-motivated, ordinary-course-of-business transaction between a lender and a borrower acting at arm's length. This is evident from a summary of the salient facts established by the evidence at trial.

#### • *Tarricone's request for the loan*

The first unusual aspect of the Giagni–ATI loan was that it was personally requested by Tarricone, rather than by any officer, director or employee of ATI.[5] Giagni testified that Tarricone "called me up, he said he needed a short-term loan, he needed some money for his businesses." (Vol. I Tr. 117) Concerning Tarricone's role at ATI, Giagni testified:

Q [I]n December of 1995, did you know whether Arthur Tarricone was still connected to ATI?

A I was really—I didn't know what the relationship at that time was between him and the company.

---

**5.** At or about the time of his indictment in 1992 Tarricone (then the sole shareholder of ATI) caused ATI to "redeem" some of his shares and he sold the balance of his stock in ATI to his daughter, Claire Tarricone, and his sons. Tarricone received a promissory note from ATI, secured by ATI's assets, in respect of the shares that were redeemed, and promissory notes from Claire and her brothers in respect of Tarricone's ATI stock which they purchased from him, secured by a pledge to Tarricone of all of their shares. It appears that no payments have ever been made to Tarricone by ATI or his children in respect of any of these notes.

Q So, you didn't know if he was an officer or president or shareholder of the company?

A No, I did not.

Q But Arthur asked you can you help ATI out?

A I guess he asked me could I help him and ATI out. And I always thought of Arthur and ATI one and the same basically. (*Id.* at 118)

Although he was pledgee of 100% of ATI's outstanding stock, after 1992 Tarricone was neither an officer, director nor employee of ATI and he had no apparent role in the management of ATI, which was run by Claire Tarricone as President and by her brothers. The fact that Claire Tarricone was running ATI adds another unusual aspect to Giagni's loan, because he and Claire "just didn't see eye-to-eye" and "didn't get along" and their relationship was "strained" (*id.* at 169, 170). When it was pointed out to him that Claire Tarricone was President of the debtor at the time of the loan, Giagni responded "I didn't know that at that time" (*id.* at 176). When it was pointed out to him that the note payable and related loan documents were signed by Claire Tarricone as President of ATI, Giagni said "I don't know if I've ever seen this document [referring to the note]" (*id.* at 176–177).

## ● *Giagni's friendship with Tarricone*

The explanation for Tarricone having requested Giagni to make the loan to ATI was of course the fact that Giagni and Tarricone had been close personal friends and golfing buddies since 1981 and continued so through the trial. The long-standing, close friendship between Giagni and Tarricone not only explains why it was Tarricone who requested the loan, it is the only credible explanation for Giagni's making the loan at all. In response to the question "what made you decide to loan

these funds to ATI?" (*id.* at 127), Giagni testified:

Well, I guess a couple of factors. Number one, Tarricone was a friend of mine for many years. We played golf together, as I said, all the time. And he called me up as a friend and could I help him out in his need. (*Id.* at 128)

## ● *ATI's insolvency in December 1995*

As already noted, the examiner's witness Andrew Plotzker demonstrated in his testimony and by documentary exhibits that ATI was insolvent as of August 31, 1995 and at all times thereafter. Plotzker testified, based upon his analysis of ATI's financial statements and other documents, that during the several years preceding December 1995 ATI had lost many millions of dollars, had borrowed millions of dollars to finance its operations from Halstead Energy, Inc. ("Halstead"), a public corporation of which Claire Tarricone was President and in which Claire Tarricone and her two brothers were controlling shareholders, and had transferred most of its assets to Halstead's wholly-owned subsidiary Halstead Quinn Propane, Inc. ("Halstead Quinn"). Prior to the Giagni loan ATI had hypothecated, and suffered tax liens covering, all of its assets and had no unencumbered property of any kind which could be used as collateral to secure a loan. In Plotzker's words, "a commercial lender would have nothing to do with this debtor" as of December 1995 (*id.* at 22).

## ● *Absence of any due diligence*

One of the most telling indicia that this was not an arm's length transaction is the fact that Giagni performed absolutely no due diligence at all, either with respect to the creditworthiness and borrowing capacity of ATI, the primary obligor, or of the guarantors, Arthur Tarricone and Claire

Tarricone.[6] He explained this in part by saying that, after Tarricone's request for the loan, he turned the matter over to his long-time attorney, Curto. Giagni's purported reliance on Curto and his failure to make any personal investigation in connection with this $200,000 loan to ATI is in marked contrast to a loan of only $47,000 which he made to a small company in which he was considering investing. Before making the loan, Giagni insisted on a 90–day period during which "I did my own due diligence on that one," his "own financial homework" (*id.* at 145). Giagni explained: "I had a 90 day agreement with these people that I could go out there for 90 days, do my due diligence during those 90 days as to whether or not I or my sons would want to get involved in this business.... [B]efore I loaned them the $47,000.00, I had this agreement in place that I would loan them the money but I needed 90 days to make an evaluation" (*id.* at 146). Giagni's explanation of the difference between this $47,000 loan and his $200,000 loan to ATI is telling. He said: "That [$47,000] loan was different than Mr. Tarricone's loan. This [$47,000 loan] was a business decision about a company out there" (*id.* at 144). The loan to ATI obviously was not a "business decision"—it was a personal decision to help out an old friend who needed short-term money for his company and could not get it from a commercial lender.

Giagni's assertion that he relied on Curto to make certain that the loan was commercially documented and reasonable is unworthy of belief. While professing that the loan was made at arm's length on commercial terms, it was perfectly clear from Giagni's own testimony that he relied not on the creditworthiness of ATI, or the loan documentation prepared by Curto, or the purported security interest in ATI receivables, or the guarantees of Arthur Tarricone and Claire Tarricone. Giagni testified repeatedly that he made the loan because his friend Tarricone asked him to, because he trusted Tarricone and, most important, because he knew that Tarricone would see to it that the loan was repaid.

The purported due diligence performed by Curto was less than paltry. The only "diligence" he exercised was to request a list of aged ATI accounts receivable from Claire Tarricone. Curto made no other inquiry whatever, and he did not even ask if the accounts receivable were subject to prior liens (which they were). As shown in the Plotzker testimony, had Giagni or Curto made inquiry, they would have learned that ATI was insolvent in late 1995 and had no accounts receivable or other unencumbered assets to pledge as collateral for a loan.

Giagni's utter indifference to commercial realities in connection with this loan cannot be reconciled with his contention that this was an arm's length transaction.

### • Giagni's knowledge of ATI's and Tarricone's finances

Although he made no investigation whatever into the finances of ATI, Arthur Tarricone or Claire Tarricone before making the loan in December 1995, there can be no doubt that Giagni had substantial background information concerning the economics of both ATI and Tarricone suf-

---

6. For example, Giagni testified:

THE COURT: At any time prior to your actually writing a check to Mr. Tarricone or to ATI for $200,000.00 when you made this loan in December, 1995, did you learn anything about Arthur Tarricone, Inc., the borrower, or its assets or its liabilities or its financial condition?

MR. GIAGNI: I wouldn't know anything about its assets or liabilities or total financial position. I did not know. (*Id.* at 168)

ficient to cause any prospective lender, acting at arm's length and motivated by commercial considerations, to make further inquiry before making a loan.

When ATI filed its first bankruptcy petition in 1986, Giagni had recently sold his businesses, semi-retired and had "a lot of free time" (*id.* at 109). "Listening to [Tarricone] on the golf course" he learned that Tarricone "was in trouble and I offered my assistance. I said if I could help you I'd be glad to help you." (*Id.* at 109) Tarricone accepted Giagni's offer of assistance, and Giagni "helped him [meaning ATI] come out of bankruptcy, whenever that was, or try to come out of bankruptcy." (*Id.* at 108–109) Giagni had meetings with Tarricone and the lawyers during ATI's bankruptcy, and Giagni served as one of the two directors of ATI as debtor-in-possession beginning at least as early as May 1988 (the other director was Tarricone) and continued as a director after confirmation of ATI's plan of reorganization in 1989, resigning from the Board by letter dated October 10, 1990. It is inconceivable that Giagni did not have full knowledge of ATI's perilous financial condition and debt structure as a reorganized debtor, including its restructured but still enormous tax liabilities.[7]

As to the financial vitality of Arthur Tarricone's guarantee, Giagni was aware of Tarricone's personal difficulties, both financial and other. Giagni testified that Tarricone "always was complaining he needed money" and that "I'm just trying to remember that he had some kind of tax problem with his companies. We would discuss that when we would sit down with the other people and talked, you know." (*Id.* at 114) Giagni also knew that Tarricone was indicted (*id.* at 115), acknowledging that he was "aware that Arthur Tarricone had some problems with the taxing authorities and had been indicted" (*id.* at 138).

### ● *Unusual terms of the loan*

Virtually everything about this loan was unusual, if not inexplicable. Why would ATI turn to Giagni, an individual who had never made a loan to or transacted business with ATI, for a commercial loan? Why would ATI borrow $200,000 at year-end for a term of 39 days? Why would a financially sophisticated individual like Giagni, with a lifetime of experience as an entrepreneur and businessman, who had never engaged in the business of lending money, make such a loan? Why would a person of Giagni's experience, who knew that in the real world of commerce lenders extend credit at the prime rate only to the most creditworthy corporate borrowers, lend $200,000 to ATI at the prime rate?[8]

---

7. To the extent that Giagni testified that he had no knowledge of the assets, liabilities or financial condition of ATI as a debtor-in-possession or as a reorganized debtor during the time that he was a member of ATI's Board of Directors, I reject his testimony as unworthy of belief. (*See e.g.,* Vol. I Tr. 181–183.)

8. I reject as unworthy of belief Giagni's testimony that one reason why he made the loan to ATI was to derive an 8–1/2% return on funds which were otherwise earning 5% or 6%. As Plotzker testified, no commercially-motivated lender would loan $200,000 to an insolvent borrower, with no unencumbered assets to pledge as collateral, which had lost millions of dollars and conveyed most of its assets to another corporation controlled by its principals during the six years after it emerged from a prior bankruptcy. The interest which Giagni might earn during the 39-day term of this loan was of no consequence to Giagni, as his own testimony showed. For example:

Q Okay. Given that you've acknowledged that the debtor is a worse credit risk than you were, why did you decide to loan the funds at the prime rate of interest?

A First of all, I'm not a shylock. That's number one. Okay? I loaned him the

None of these questions can be answered on the record before this Court.

### • *Giagni's failure to act on ATI's default*

Although ATI defaulted on its debt to Giagni in that the loan was not paid within 39 days as provided in the note, at no time did Giagni take legal action against ATI or the loan guarantors to enforce the note. Indeed, Giagni did not even telephone ATI or Tarricone to request payment or to inquire about the status of the loan or ATI's financial condition. Asked about ATI's default from a commercial perspective, Plotzker testified:

> I cannot conceive of an arm's length lender not taking severe action for nonpayment of a presumably secured loan for such a protracted period. (*Id.* at 43)

Giagni's reaction to ATI's default speaks volumes as to the non-commercial, essentially insider nature of the debtor-creditor relationship between Giagni and ATI.

Q Were you concerned that the debtor had not repaid the loan on February 5th when it was due?

A No, I wasn't concerned.

Q Why not?

A Because I knew the man for 20 some odd years I guess. He belongs to the same club. I see him every week. He's always been honorable to me. I had no concern. Also, he told me that he couldn't pay it that date, could he pay me a little bit later. I said sure. (*Id.* at 149–150)

Q Did you contact him first about the loan, or did he contact you?

A No, he contacted me and told me that he'd be a little late.

money which I thought was fair. I knew the man and he asked me for a loan. I had the documents and I loaned him at eight and a half percent. I don't

Q So, you weren't worried about the loan until he called you and spoke to you about it?

A I was never worried about the loan. (*Id.*)

Q So, at some point in February, 1996, you received $100,000.00. Were you satisfied with the progress of the payment by that time?

A I wasn't upset.

Q And why weren't you?

A Because I knew the man. (*Id.* at 152)

Despite ATI's default, Giagni never made a single inquiry concerning ATI's financial position or the financial condition of either Tarricone or Claire Tarricone as guarantors. *See id.* at 151, 153.

### • *ATI's use of funds to repay the Giagni loan*

█ In determining insider status as to a particular creditor, it is relevant to consider whether the debtor's decision to repay a particular antecedent debt owed to the creditor in question made sense from an economic or commercial point of view, bearing in mind that the issue does not arise except in circumstances where the debtor is insolvent at the time of the repayment. In some cases it may be appropriate or even necessary from a commercial point of view for an insolvent debtor to use scarce working capital to repay a debt, for example, to a valued supplier or customer, or to a lender threatening litigation which could have serious adverse consequences.

As noted above, ATI constantly operated at a deficit after the spinoffs of assets to Halstead Quinn beginning in 1992, and

think another one or two percent would have made a huge difference to me." (*Id.* at 178)

the only means of repayment to Halstead was the transfer of additional revenue-generating assets. It might have made sense for ATI to use its limited cash to pay suppliers or to repay the Halstead debt rather than to continue divesting its income-generating properties. But viewing the ATI payments to Giagni from an objective, accounting perspective, Plotzker could find no economic rational for repayment of this particular antecedent debt. He testified:

Q From an accounting perspective, given the debt that was outstanding from the debtor in February of '96, did it make economic sense for the debtor to repay $100,000.00 to Mr. Giagni?

\* \* \* \* \* \*

A I am aware that in order to pay back the Halstead Quinn indebtedness, both during this presumed forbearance period as well as subsequently, the only means in which ATI could repay Halstead was to divest itself of significant assets. So I would think that cash was at a premium for this debtor and it could have found better ways of spending $100,000.00. (*Id.* at 50–51)

● *Significance of the personal guarantees here*

 Personal guarantees by insiders of a corporate debt owed to a creditor may tend to either support or rebut a trustee's argument that the creditor should be deemed a non-statutory insider. For example, evidence that the creditor duly investigated the financial resources of the insider-guarantor and perhaps took other steps to ensure that the guarantor could and would pay the debt in the event of a default by the insider's corporation (*e.g.*, a lien on or pledge of property of the guarantor), combined with other probative evidence, might persuade the court as trier of fact to conclude that the relationship between the creditor and the debtor was arm's length, notwithstanding a close relationship between the creditor and the insider.

On the other hand, a creditor's manifest indifference to the economics of the insider's guarantee, coupled with other facts indicating that the transaction was not arm's length, may give rise to a strong inference that the real purpose of the insider guarantee was to serve as an incentive to ensure that the insider would see to it that the corporate debtor repaid the creditor so that the guarantor might avoid personal liability. Such is the case here. The testimony of Giagni's lawyer, Curto, is persuasive on this point:

THE COURT: Why did you ask for guarantees?

MR. J. CURTO: Because I thought guarantees were better, with guarantees than without guarantees.

THE COURT: Why?

MR. J. CURTO: They make a loan more secure in my opinion.

THE COURT: How do you know?

MR. J. CURTO: Generally people that are on the hook for something want to make sure that the debt gets paid. That's what the guarantee is for. They're telling me that if the debtor doesn't pay it, the person that owes the money on the note, that we back it up.

THE COURT: Well, are you saying that you want the guarantee because if the individuals are on the hook if the corporation doesn't pay, they're more likely to see to it that the corporation pays?

MR. J. CURTO: I think that's a true statement, yes. That's what guarantees are for I think. Puts more pressure on everybody to get the thing done.

THE COURT: To cause the corporation to pay its debt; is that correct?

MR. J. CURTO: I think that's correct, yes. (*Id.* at 203)

Of the two basic objectives of personal guarantees, the second (resort to the guarantors' assets) clearly was not of any concern to either Giagni or Curto. Neither did any due diligence as to Arthur or Claire Tarricone's finances. For Curto, the purpose of the guarantees was to "put more pressure" on Claire and Arthur to make sure that ATI paid off Giagni. Curto testified:

THE COURT: And do I understand from your testimony that neither you nor to your knowledge anyone on your or your client's behalf did any due diligence with regard to the financial ability of either Claire or Arthur Tarricone to pay the guarantees?

MR. J. CURTO: I didn't look at any financial statements, so to that extent then I did no due diligence.

THE COURT: My question though is broader than whether you looked at any financial statements. My question is this. Did you or, to your knowledge, anyone on behalf of you or your client, Mr. Giagni, make any inquiry at all, do any due diligence at all with regard to the financial ability of Claire or Arthur Tarricone to pay on this indebtedness?

MR. J. CURTO: No. (*Id.* at 203–204)

THE COURT: You say you did no due diligence with regard to the credit worthiness and ability to pay $200,000.00 of either Claire or Arthur, correct?

MR. J. CURTO: Correct, Your Honor.

THE COURT: Didn't even ask a question about that subject, correct?

MR. J. CURTO: I don't believe so, Your Honor.

THE COURT: All right. That would suggest to me, and I'm asking you whether it's a fair inference, that would suggest to me that there is an inference that the reason for asking for the guarantees, aside from the possibility, which you didn't really know as a possibility that they might be able to pay in the event of a default, that the real reason for seeking the guarantee was to ensure that these two people who controlled the company would make sure that the company paid the debt. Is that a fair inference?

MR. J. CURTO: Yeah, I would say that's a fair inference. (*Id.* at 205)

### III. *Ultimate findings and conclusions*

Upon all the evidence I conclude that Giagni must be deemed a non-statutory insider within the scope of Section 101(31)(b) and the case law.

Giagni's loan to ATI was not a commercially-motivated, arm's length transaction. It was not made in the ordinary course of business, either for Giagni or ATI. At the time of the loan ATI had operated at a loss since its prior bankruptcy, had transferred a substantial part of its assets to an affiliate controlled by Claire Tarricone and her brothers, had no unencumbered assets and was insolvent. No commercial lender would have loaned money to ATI in December 1995.

Giagni was familiar with ATI's financial structure as a reorganized debtor, having been a director of ATI until October 1990. He also knew that Tarricone personally was "always complaining" about money and had been indicted for tax fraud in 1992. Yet he loaned $200,000 to ATI without any investigation, due diligence or inquiry, by himself or his attorney. The loan was made solely because of Giagni's long and close personal relationship with Arthur Tarricone, and because he had per-

fect confidence that Tarricone would see to it that the loan would be repaid, even after it went into default.

The personal guarantees of Arthur and Claire Tarricone had no significance to Giagni or Curto as potential sources of loan repayment, because neither made any inquiry as to Claire's or Arthur's financial resources. But, as is intuitively evident and as shown in Curto's testimony, the guarantees were significant incentives to both Claire Tarricone and her father to see to it that ATI repaid Giagni in order to avoid personal liability themselves, even if ATI had more pressing uses for working capital. The only real (and intended) consequence of the personal guarantees was to make Giagni the functional equivalent of an insider, since ATI's two most influential statutory insiders had to cause ATI to pay Giagni to avoid their own personal liability.

■ The ultimate test which courts should apply in subjecting the participants in a particular transaction to the "closer scrutiny than those dealing at arm's length with the debtor" is whether the creditor is as likely to receive preferential treatment as the statutory insiders enumerated by Congress in subsections (i)—(vi) of Section 101(31)(B). Giagni meets this test. On the facts in this case, the likelihood of Giagni's receiving preferential treatment was at least as great as officers, directors and relatives, all of whom are statutory insiders, enhanced as it was by the personal guarantees of ATI's President and her father, both of whom were statutory insiders with the power and a compelling motive to cause ATI to repay Giagni so as to avoid personal liability for themselves.

The examiner is entitled to judgment on his claims against Giagni in respect of the June 28, 1996 payment of $100,000 and the May 15, 1997 payment of $3,155.71. Coun-sel for the examiner is instructed to settle an order consistent with this decision.