### In re FOURTHSTAGE TECHNOLOGIES, INC., Debtor.

**MCA Financial Group, Ltd., as Trustee for the Fourthstage Technologies, Inc., Liquidating Trust, Plaintiff,**

v.

**Hewlett–Packard, Defendant.**

**Bankruptcy No. 2:01BK17604–EWH. Adversary No. 2–03–00962.**

United States Bankruptcy Court, D. Arizona.

Nov. 15, 2006.

Christopher H. Bayley, Esq., Jonathan M. Saffer, Esq., Snell & Wilmer L.L.P., Phoenix, AZ, for MCA Financial Group, Ltd., as Trustee for the Fourthstage Technologies, Inc. Liquidating Trust.

Cecily A. Dumas, Esq., Brandon C. Chaves, Esq., San Francisco, CA, Larry G. Haddy, Esq., Howard C. Myers, Esq., Burch & Cracchiolo, PA, Phoenix, AZ, for Hewlett–Packard Company.

## MEMORANDUM DECISION

EILEEN W. HOLLOWELL,
Bankruptcy Judge.

### *INTRODUCTION*

MCA Financial Group, Ltd., as Trustee for the Fourthstage Technologies, Inc. Liquidating Trust ("Trustee"), sued Hew-

lett–Packard ("HP") to recover payments made by Fourthstage Technologies, Inc. ("Fourthstage" or "Debtor") to HP in 2001, pursuant to a settlement agreement. The Trustee seeks to set aside the payments as avoidable preferences under 11 U.S.C. § 547, alleging that HP was an insider of the Debtor and the transfers were made within one year from the Debtor's filing for bankruptcy on December 31, 2001.

This matter comes before the Court on HP's Motion for Summary Judgment, asserting that the Trustee's claim must fail because there is insufficient evidence as a matter of law to establish that HP was an insider of the Debtor. Because the undisputed facts demonstrate that HP was not an insider, the motion is granted.

### FACTS

MSI Holdings, Inc., doing business as Aperian, ("Aperian") was in the business of providing internet access and related services for companies through the operation of data centers. HP sought to sell its products to Aperian and to promote HP's products to Aperian's customers.

On August 3, 2000, Aperian executed a Convertible Secured U.S. $40,000,000 Promissory Note ("Note") with HP. The parties also entered into a Note Purchase Agreement and Registration Rights Agreement ("Related Loan Documents"). Under the terms of the Note, Aperian could obtain four loans, in the aggregate principal amount of $40,000,000. Section 10(b) of the Note stated that fifty percent of the loan proceeds must be used to purchase HP products, support or services. That Section further provided that the remainder of the proceeds could be used to purchase non-HP hardware, software, support and services. The Note was secured by all HP equipment and non-HP equipment acquired with the loan proceeds ("Collateral").

The Note entitled HP to convert all or some of the outstanding obligations under the Note into shares of common stock of Aperian at a pre-determined conversion price. HP never exercised its right of conversion. HP was also entitled to have a representative attend Aperian's Board of Directors' meetings in a non-voting observer capacity. HP never exercised its right to an observer seat.

By the end of 2000, Aperian had drawn $20 million under the Note. In January 2001, HP requested an accounting of the use of the loan proceeds from Aperian. In March 2001, Aperian accounted for only about $14 million of the loan proceeds. Of that amount, less than $5 million had been used to purchase HP products, support and services; approximately $5 million had been used to purchase furniture, advertising and architectural services. The balance of the loan proceeds, about $6 million, was not accounted for. At a meeting held on March 20, 2001, HP raised concerns with Aperian about its use of proceeds under the Note.

On April 6, 2001, Aperian acquired Fourthstage. Kevin Craig ("Craig") founded Fourthstage, a technology company that was a reseller for Sun Microsystems products. After the merger, the new company was called Fourthstage[1] and Craig was its co-CEO. The Debtor informed HP of the acquisition and its intention to draw another $10 million under the Note, by letter dated April 9, 2001. HP had no knowledge of the merger before it occurred.

HP informed the Debtor by letter dated April 12, 2001, that it was not in compliance with § 10(b) of the Note because, of

---

**1.** Aperian and Fourthstage will hereafter be referred to as the "Debtor."

the $20 million drawn under the Note, only $4.8 million had been used to purchase HP products and about $5 million had been used for purposes not permitted by the Note—advertising, furniture and architectural fees. The letter further stated that unless the obligations under § 10(b) were satisfied within fifteen business days, the failure would constitute an Event of Default under the Note. Counsel for the Debtor replied by letter dated April 19, 2001, asserting that the Debtor was in full compliance with the Note. HP reiterated its position in a letter dated May 1, 2001.

In May 2001, HP rejected the request from Craig for a third draw under the Note. On May 17, 2001, HP sent a letter to the Debtor stating that its use of proceeds constituted an Event of Default and that all sums under the Note were immediately due and payable. Craig asked HP to withdraw the May 17, 2001, Notice of Default because, as a public company, the Debtor would be required to disclose the default notice in its financial disclosures. On May 18, HP retracted its May 17 default letter with the understanding that it could be reissued after the parties met on May 24.

The parties and their counsel met on May 24, and negotiations were initiated to resolve their differences. On July 20, 2001, the Debtor (in the name of Aperian, Inc.) and HP entered into a Settlement and Mutual Release Agreement ("Settlement"). Under the terms of the Settlement, the Debtor agreed to pay $7.5 million to HP in full satisfaction of its obligations under the Note and Related Loan Documents. HP agreed to release its lien and security interest in the Collateral; the Related Loan Documents were terminated. The Settlement included a general mutual release between the parties. The Debtor paid $7.5 million to HP on July 31, 2001.

## ISSUE

Was HP a non-statutory insider for purposes of § 547(b)(4)(B), permitting the Trustee to avoid the Settlement payment as a preferential transfer?

## STATEMENT OF JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order 128 of the United States District Court for the District of Arizona. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). Venue is proper under 28 U.S.C. § 1409.

## DISCUSSION

Summary judgment should be granted when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056. Ordinarily, the determination of insider status is a question of fact. *In re Friedman*, 126 B.R. 63, 67 (9th Cir. BAP 1991). Where the underlying facts are undisputed, however, the question is whether those facts meet the legal standard. *See In re Schuman*, 81 B.R. 583, 586 n. 1 (9th Cir. BAP 1987). The parties to this action agree that there are no material facts in dispute.

The parties have also agreed upon the appropriate legal standard for determining whether HP was an insider. The parties agree that the Court should apply the non-statutory insider analysis—not the statutory or "per se" definition of insider found under § 101(31).[2] (Hearing Transcript at 37, l. 25; 38 ll. 1–7.)

---

2. The parties initially briefed the issue of whether HP was a statutory insider, but later agreed that the question should be limited to the non-statutory analysis.

In addition to insiders identified by the Code, the non-statutory analysis recognizes that insider status may be based upon a professional or business relationship with the debtor, which "compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *Friedman*, 126 B.R. at 70. Support for this relational classification is found in the legislative history of the statutory definition of insider, which provides that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *Id.* In making this determination, courts generally focus on two factors: (1) the closeness of the relationship between the parties; and (2) whether the parties' transactions were conducted at arm's length. *See, e.g., In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr.S.D.N.Y. 2002) (citations omitted).

HP argues that the parties had a business relationship, which was governed by the terms of their vendor financing agreement, and that their dealings were consistent with that agreement. HP's refusal to lend the third tranche and to negotiate a more favorable settlement of the outstanding balance of the Note does not evidence an insider relationship, but reflects HP's exercise of its contractual rights to declare a default because the Debtor had used the Note proceeds for unauthorized purposes. Unlike the relationship in *Tarricone*, relied upon by the Trustee, the relationship between HP and the Debtor was fundamentally a business relationship—not one based upon personal affinity.

HP further argues that its actions vis à vis the Debtor were all at arm's length and conducted through counsel; the default notice, negotiations and ultimate Settlement were all conducted between the parties' lawyers. The Settlement was executed in an adversarial atmosphere and at arm's length.

In opposition, the Trustee argues that HP is a non-statutory insider by virtue of its close business relationship and lack of arm's-length dealing with the Debtor. The Trustee argues that the relationship was not bank and borrower, but a business alliance or partnership in which HP sought benefits beyond collecting interest and principal on the Note. Further, HP did not deal at arm's length because it was slow to declare a default; it refused to fund the third tranche, although no default had been declared; and, once it did declare default, it immediately withdrew its default notice, when the request was made, to enable the Debtor to avoid publicly disclosing the default. In sum, HP utilized its close relationship and insider dealing to get out of its contract with the Debtor and to negotiate a settlement that required the Debtor to pay HP almost all of its available cash at a time when HP's Collateral was worth far less than the Settlement amount.

The Trustee also argues that the instant case is virtually indistinguishable from or parallel to *In re Winstar Communications, Inc.*, 348 B.R. 234 (Bankr.D.Del. 2005). The Trustee asserts that, like the lender-supplier Lucent in that case, HP's close relationship with the Debtor and its ability to apply financial pressure on the Debtor ultimately allowed it to obtain a preferential payment.

But the ability to apply financial pressure does not require a finding that HP was an insider. The inquiry into whether HP was an insider focuses on whether HP's relationship with the Debtor was "close enough to gain an advantage attributable simply to affinity rather than

to the course of business dealings between the parties." *Friedman,* 126 B.R. at 70. As *Friedman*—the case relied upon by both parties—points out, "while a creditor may be in a strong bargaining position in dealing with the debtor, so long as the parties transact their business at arm's length, such circumstances do not necessarily give rise to insider status even though there was some degree of personal relationship with the debtor." *Id.*

■ First, turning to the nature and closeness of the relationship, the Trustee is correct that the relationship was not simply creditor and borrower. However, it was a business relationship—one in which each side sought commercial gain and which was governed by the Note and Related Loan Documents. When HP determined that the Debtor was not in compliance with the terms of the Note, it sought to exercise its rights under the Note and Related Loan Documents, which resulted in the termination of HP's relationship with the Debtor.

The relationship between Aperian and HP was not close, as evidenced by the Debtor's merger with Fourthstage, which was accomplished without HP's knowledge. Moreover, Fourthstage was a reseller for Sun Microsystems—an HP competitor.

With respect to the Settlement payment, which is the challenged transfer, HP did not obtain the Settlement payment because of its affinity with the Debtor. To the contrary, the course of dealing escalated from differences between the companies to negotiations through counsel. The fact that there were intermediate steps before the May 17, 2001, Notice of Default and that it was withdrawn so that the parties, through counsel, could negotiate, does not vitiate the arm's length nature of the dealings. It is true that HP was in a superior bargaining position as the lender in the relationship, but non-statutory insid-

er status cannot be based only a superior bargaining position in a contractual relationship with a debtor. *See Friedman,* 126 B.R. at 70. As the court in *Tarricone* pointed out, it may be appropriate or necessary from a commercial point of view for a debtor to use scarce funds to repay a debt to a lender threatening action that could have serious adverse consequences. *See* 286 B.R. at 272.

The Trustee's reliance on *Tarricone* and *Winstar* is misplaced because both are easily distinguishable from the facts in this case. In *Tarricone,* the debtor repaid a loan from a golfing buddy, which had been given out of friendship and was not commercially motivated. The court found that it was not an arm's length transaction; in fact, "no commercial lender" would have loaned the money. 286 B.R. at 274. In contrast, HP made the loan in this case to sell products to the Debtor and the Debtor's customer base.

In *Winstar,* the parties entered into a contract, marketed as a "strategic partnership," to benefit both sides and the relationship degenerated. 348 B.R. at 251. The standard applied in that case was a statutory insider, *viz.,* a "person in control of the debtor" under § 101(31). The court found that Lucent did, in fact, control the debtor by, *inter alia,* controlling decisions relating to debtor's network, forcing the debtor to falsify records and treating the debtor "as a captive buyer for Lucent's goods." *Id.* at 280. Those are not our facts, and the Trustee has conceded for purposes of this motion that HP was not a statutory insider. (Hearing Transcript at 37, l. 25; 38 ll. 1–7.)

### CONCLUSION

The Trustee can avoid certain transfers that occur within the requisite period before the filing of the bankruptcy petition.

§ 547(b). Because in this case the Settlement payment occurred more than ninety days, but less than one year before the Debtor filed its petition on December 31, 2001, the transfer is avoidable only if HP was an insider at the time of the transfer. § 547(b)(4)(B). Because HP was not an insider of the Debtor when the parties entered into the Settlement, on July 20, 2001, which resulted in the payment to HP, HP is entitled to summary judgment. A separate Order will be entered in favor of the Defendant and dismissing the Adversary with prejudice.